53 CCPA

### Application of Harold W. ADAMS.
### Patent Appeal No. 7611.

United States Court of Customs and Patent Appeals.
March 17, 1966.

Almon S. Nelson, Washington, D. C., for appellant.

Joseph Schimmel, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 11–15 of application serial No. 81,082, filed January 6, 1961, for "Heat Transfer Method." No claims have been allowed. The sole issue is the obviousness of the invention under 35 U.S.C. § 103.

The invention is exemplified by reference to the cooling of cans of food as they emerge in a continuous stream from a cooker in which the food has been cooked in sealed cylindrical cans. Cooling takes place in apparatus upon which appellant has improved, the basic machine being described in the principal reference relied on to support the rejection, U.S. Patent No. 2,794,326, entitled "Method and Apparatus for Cooling Canned Goods," issued June 4, 1957, to Mencacci, assignor to Food Machinery and Chemical Corporation, San Jose, California. Appellant Adams, according to his affidavit of record, is a staff research chemist employed by the "Canning Machinery Division of FMC Corporation at San Jose, California." At argument it appeared that the Mencacci patent and the present application are in common ownership.

A brief description of the Mencacci cooler will aid in understanding appellant's admittedly novel method since one of the principal ways of practicing it, as described in the application, is by modifying the Mencacci apparatus and the method it carries out.

The application describes the involved cooler as of "the well known reel and spiral type * * *." It is a large horizontal cylindrical machine having within the supporting framework an exterior helical track for cans inside of which is a reel, coextensive with the helix, having can-holding compartments formed by longitudinal angle bars. Cans are fed in at one end and drop into the compartments on the reel and as the reel rotates the helical tracks cause the cans supported on the reel to move in a helical path from one end of the cooler to the other. The helical track pushes them along the compartments on the reel and the angle bars which form the compartments push the cans around the track as the reel rotates. At the bottom portion of each revolution the cans roll on the track so that their contents are stirred up which helps to dissipate heat from the inside.

From the drawings of appellant's application and Mencacci it would appear that two or three dozen cans would be present in each turn of the helix and that there might be fifty or sixty turns. One or two thousand cans would therefore be going through the cooler at the same time. As they progress from the hot to the cold end, they are cooled by the application of water. It is in the mode of its application that the invention resides.

In the Mencacci cooler water is sprayed onto the cans from spray nozzles, said to produce "jets" of water, the nozzles being attached to headers which extend along the top of the cooler. It would seem that one nozzle is used for each revolution of the helical track. The headers are arranged in three groups or cooling zones. The used water is caught in the bottom of the cooler in these zones and is recirculated by pumps in a selective way so that, for instance, the water

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

at the cold end of the cooler, which becomes warmed in cooling the cans, is reused in the middle zone where the cans are hotter and the water from that zone is reused at the hot entrance end so that the hotter the cans the warmer is the water sprayed on them. Thus the temperature differential between the cans and the water is about the same in each zone. It is said that an excessive differential might damage the cans. In addition to the above-described sprays, which impinge upon the upper sides of the cylindrical cans at the top of the machine, Mencacci has header pipes coaxial with the reel, in the center of the cooler, provided with nozzles which spray water "radially in substantially all directions," which water impinges on the surrounding cans as they traverse their helical paths.

Appellant's application, referring to known coolers, evidently of the Mencacci type, says that the water is sprayed onto the containers "by fan type sprays or the like, as the cans pass continuously through the cooler."

Appellant has substantially increased the efficiency of coolers of the above type, by 26% he alleges in his specification, through the seemingly simple expedient of replacing the fan spray nozzles with a ubiquitous little device, the no-splash water aerator common to household kitchen sinks for a generation and now even more common in the modern washbasin. The broad statement of his invention is:

> In accordance with the present invention, it has been discovered that replacement of the fan-type spray nozzles with aerating or foam nozzles greatly improves the cooling efficiency of the above cooler.

■ The Patent Office says this invention is obvious, citing an Aghnides patent, No. 2,811,340 issued October 29, 1957, the same year the Mencacci patent issued, but also relying more heavily on an earlier Aghnides patent, No. 2,210,-846, issued August 6, 1940, and mentioned in the "Aghnides patent of record." [1]

Both Aghnides patents relate to and describe various forms of the now commonplace water aerating attachment for faucets and it is not seen that we need describe them further other than to make clear that what they do is to entrain in the stream of water issuing from the faucet a multitude of air bubbles and break up the air-water mixture into fine streams by means of screens, thus producing "white water" with no-splash characteristics. We believe most everyone is familiar with this phenomenon as described in the passage from the Aghnides patent not "of record" before the board on which the Patent Office now particularly relies as the most significant prior art teaching, reading:

> When my device is functioning, the water, due to the thorough admixture of air, has characteristics which are surprisingly different from those of water as ordinarily discharged from a faucet. For example, if one's hand is put in the course of the water, the water will flow evenly and uniformly over the surface and will wet the entire surface without splashing.

This surprising result was disclosed to the Patent Office in December 1937, in a corresponding Belgian application in 1934 (according to the patent heading), and to the world in the issued U.S. patent in 1940. Thirteen years later, June 26, 1953, Mencacci applied for his patent on the can cooler employing jet spray nozzles and six and a half years after that appellant filed his application teaching how to improve its efficiency by 26%, primarily by using Aghnides' aerator on it instead of sprays. It is now contended that that improvement has always been obvious by reason of certain "axiomatic" principles. We disagree.

Illustrative of the claims on appeal is claim 13, which reads:

> A method of cooling containers having rounded exterior surfaces consisting of the steps of

1. According to appellant's brief, the examiner had also relied on a third Aghnides patent, No. 2,633,343. We have not seen this patent.

moving the containers along a helical path generated about a horizontal axis, directing cooling water tangentially of said path and downward at spaced points along said helical path toward the exterior surfaces of the containers as they move downwardly,

introducing air into said water prior to the contact of water with the containers to form a foam coolant having qualities which minimize splashing and encourage the even spreading of the foam upon contact with the containers to more effectively follow the contour of the containers and wet the containers,

and forming coatings of said foam in heat-transfer relation substantially entirely around the exterior surfaces of the containers.

The meaning of this claim will best be appreciated by reference to sketches in Adams' affidavit explaining the difference in action of a regular jet spray and a foam spray when projected at a rounded exterior surface such as a food can.

FIG. 1

REGULAR SPRAY NOZZLE
WATER
CONTAINER

FIG. 2

FOAM SPRAY NOZZLE
AIR & WATER MIXTURE (FOAM)
CONTAINER

What appellant means in his claims by the tangential direction of the water streams will be understood from his description of the apparatus in which he places two water headers above the cooler, one at 30° to the right of the vertical axis, as viewed from one end, and the other 60° to the left, or 90° apart. The aerator nozzles thereon are positioned to direct streams downwardly and along paths substantially tangent to the reel on opposite sides of the cooler. Of course the cans are moving beneath the streams as the reel revolves, and are wetted once on coming up and again on going down.

In the application Adams says:

Although it is not completely understood why the foam spray improves the cooling rate, the above tests and visual observations indicate that the air entrained in the cooling water cushions the impact of water upon the cans thereby greatly minimizing the splashing of water from the cans and also causing the water to follow the contour of the cans to wet substantially the entire surface thereof.

There are two significant facts with respect to the references. Mencacci says nothing whatever about using aerated water for cooling. Aghnides says nothing whatever about using any of his nozzles or the aerated streams produced thereby for cooling or for heat exchange.

The examiner in his answer said the only real issue is whether the Mencacci and Aghnides patents "can be combined in rejecting the claims." This quite common but relatively meaningless statement does not state the real issue at all and it is not now and never has been clear what the expression "can be combined" is supposed to mean. The real and only issue under 35 USC 103 is whether the invention as a whole would have been

obvious to those skilled in the art at the time Adams made it in view of the state of the art as we are able to glean it from the references cited. Of course *all* of the references may be used to show what the art knew, and in that sense "combined" but the fact remains that neither reference contains the slightest suggestion to use what it discloses in combination with what is disclosed in the other.

■ Under the circumstances of this case, which includes the availability of Aghnides' aerator nozzles for 13 years before the Mencacci cooler was disclosed, not only as presumptively available prior art by virtue of the issued patent but, we judicially notice, as commercially available and very commonplace consumer items, we deem it very significant that Adams was the first to suggest, as far as the record shows, the use of aerated streams in a water spray cooler for cans or other rounded objects.

The Patent Office presents a number of hindsight arguments. It says Adams was not the first to *use* foam for *heat transfer* as fire departments and fire extinguisher users have been squirting foam on fires for years and housewives have been pouring aerated hot water on cold plates in the kitchen sink for years, in both of which operations heat transfer is *inherent*. Of course it is inherent, otherwise appellant's invention would not work. But patentability here does not hinge on inherency. It depends on the unexpected and unsuggested increase in heat transfer *efficiency*. No reference suggesting this has been produced, only ex post facto explanations at to why anyone should have been able to see that it would be more efficient to use aerated water. But even Adams, with a college degree in chemistry and a doctorate in food technology eight years before he made his invention, explained, after the completion of his invention, that it was not quite clear why the improved efficiency results. The examiner made no attempt to explain why it would be obvious, other than to say aerating or foaming *rinse* water is commonplace. The board

opined that "it is axiomatic that heat transfer will be improved by subjecting articles to be cooled to a stream of cooling liquid with minimum waste by splashing and a stream which is so formed that the contact between the articles and the stream particles is increased." It felt using Aghnides nozzles to reduce splashing and increase contact would be an obvious change in a heat transfer method but we regard this as mere hindsight analysis of appellant's teaching with no basis at all in the absence of access to his teachings. It seems to us that one of the primary objects of Mencacci was to *splash* water on his cans. In his cooling method, as carried out in his cooler, the wetting is not continuous but intermittent and an important part of the cooling method as described in the Mencacci patent is in the use of air, produced by a blower, to evaporate liquid from the cans after wetting them. He says:

> The cool air thus supplied displaces the warm air within the chamber and accelerates the dissipation of heat from the cans by both *convection* and *conduction.* \* \* \* The fresh air supplied by the fan therefore promotes *evaporation* of moisture on the can surfaces, and thereby increases to a very considerable degree the amount of heat which is absorbed from each can in the process of vaporization of the moisture. Dissipation of heat by each of *the three principles of heat loss* by the cans and their contents is still further expedited by the tumbling \* \* \*. [Emphasis ours.]

This evaporation is a function of the machine throughout the cooling process and the machine was designed to wet the cans from all sides, the water dripping from the cans being recirculated. We see nothing to suggest any need for an improved wetting of the cans. We find no teaching, axiomatic or otherwise, to suggest the greater efficiency which Adams has discovered.

Finally, the solicitor adds the argument that the *superiority* of appellant's heat transfer is *inherent* in the use of

foam. Again we observe that, of course, it is. But the art does not suggest the use of foam in heat transfer of any kind and there is not the slightest suggestion that anyone *knew* of the existence of this inherent superiority until Adams disclosed it. After all, Bell's telephone was "inherently" capable of transmitting speech, DeForest's triode was "inherently" capable of amplification, and, to come down to date, so was the tiny transistor which is rapidly supplanting it. Two of our decisions are cited as supporting the erroneous notion that "subject matter cannot be patented on the basis of an inherent property." We think the proposition thus broadly stated and as applied here is so transparently erroneous as not to require discussion.

We deem it unnecessary to deal with the differences in scope and the broadest claim as effectively distinguishes from the references as any of the others.

The decision of the board is reversed. Reversed.