53 CCPA

**Application of Julius DIAMOND and Milton Kellman.**

**Patent Appeal No. 7501.**

United States Court of Customs and Patent Appeals.

May 12, 1966.

———◆———

Greist, Lockwood, Greenawalt & Dewey, Chicago, Ill. (Fred S. Lockwood, Chicago, Ill., of counsel), for appellants.

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

Clarence W. Moore, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for Commissioner of Patents.

Before RICH, Acting Chief Judge, MARTIN, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This is an appeal from a decision of the Board of Appeals affirming the rejection of all the claims in appellants' application [1] as obvious in view of certain prior art within the meaning of 35 U.S.C. § 103.

Section 103 requires us to determine whether or not the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole was obvious. The parties have come to issue on the question of whether evidence relating to a therapeutic composition shows that the composition exhibits such unexpected results, in terms of an unexpected synergism, as to be non-obvious. Appellants do not rely on their evidence, submitted in "Case Reports" that are discussed in detail below, as showing unexpected results in qualitative statements of the patients as to the efficacy of the therapeutic composition. Rather, appellants posit their case on increased potency evidenced by quantitative reductions in dosage; that, they contend, is a synergism probative of non-obviousness. We think that appellants would be entitled to prevail should they show such synergism to be unexpected. However, we conclude, upon a review of the record, that there is insufficient proof of synergism in the dosage itself, and a fortiori, appellants have not proved it unexpected. We shall first consider the invention before considering the evidence.

1. Claims 1–14 in serial No. 49,445, filed August 15, 1960, for "Therapeutic Compositions and Methods of Making the Same."

As stated in appellants' specification:

This invention relates to therapeutic compositions and preparations which contain in admixture or in intimate association, a water soluble form of adenosine-5-monophosphate [A5MP] and a glucocorticoid of the group comprising prednisolone and hydrocortisone, and functional derivatives thereof. More specifically, the invention relates to such therapeutic compositions which may be in the form suitable for oral administration or for parenteral use. These compositions and preparations have utility in the treatment of bursitis, tendinitis, myositis, acute arthritis, neuritis and related conditions.

All of the appealed claims define compositions and recite the two ingredients, A5MP and glucocorticoid. Claims 1 through 8 define the composition broadly as a combination of the two ingredients, claims 9 through 11 recite the combination in the form of a layered tablet, the ingredients being in different layers, and claims 12 through 14 recite the combination in a gelatin vehicle.[2]

The references relied on for the rejection of the claims are:

Feinberg et al., Methylprednisolone (Medrol), A Potent New Anti-Inflammatory Steroid, 165 J.A.M.A. 1560 (1957)

"Adenosine-5-Monophosphate," U.S. Dispensatory 1526 (25th Ed., 1955)

"Medrol," Annals of Internal Medicine 38, (Oct. 1957) (Advertisement)

"Co-Hydeltra," J. Allergy 29 (July 1956) (Advertisement) 19 J.A.Ph.A.

(Pract.Pharm.Ed.) 15 (Jan. 1958) (Advertisement)

"Adenolin," Physicians' Desk Reference 699 (12th Ed., 1958)

Sollman, Combination Therapy, A Manual of Pharmacology, 38 (8th Ed. 1957)

Drill, Pharmacology in Medicine, 73/12 Table 73/3 (1954)

Goodman et al., Drug Combination, Pharmacological Basis of Therapeutics, 11 (2d Ed. 1955)

We find it unnecessary to discuss several of these references in detail since they show no more than what is acknowledged in appellants' specification:

While adenosine-5-monophosphate and glucocorticoids such as prednisolone and hydrocortisone, and their functional derivatives, have known utility in the treatment of disorders such as bursitis, so far as is known these two different active therapeutic agents have not been used in combination for treatment of such disorders or for any other purpose.

Thus, the U. S. Dispensatory publication, the "Medrol" ad, the Feinberg et al. article, the "Co-Hydeltra" ad, and the cited portion of the Physicians' Desk Reference all show adenosine-5-monophosphate (A5MP) *or* the glucocorticoid (steroid) component *separately* useful in treating collagen diseases. The "Co-Hydeltra" ad and the J.A.Ph.A. ad show layered pills; appellants do not predicate patentability on the layered pill form of the composition and thus no separate issue is presented thereby.

2. Exemplary claims are:
1. A therapeutic composition comprising a soluble form of adenosine-5-monophosphate and a glucocorticoid selected from the group consisting of prednisolone and functional derivatives thereof and hydrocortisone and functional derivatives thereof.
9. A therapeutic tablet comprising an outer shell for sublingual absorption containing from about 15 to 50 mg. of the sodium salt of adenosine-5-monophosphate and an inner core for gastrointestinal absorption containing from about 1 to 5 mg. of prednisolone.
12. A prolonged acting therapeutic composition comprising from about 5 to 30 parts of micronized prednisolone acetate suspended with the aid of gelatin in a solution containing from about 15 to 100 parts of the sodium salt of adenosine-5-monophosphate.
The remaining claims in each group are narrower in their recitation of limitations as to parts (by weight) of the constituent components.

The examiner's position, particularly with respect to the Goodman et al. (Goodman) and Sollman references, was summarized fairly by the board (footnote by the court):

> The Examiner's position is that the combination of two drugs, each shown to be old by the prior art for use in treating inflammatory diseases, is obvious * * *.[3] The Examiner has cited the Goodman * * * reference which teaches generally that when drugs having the same type of action are given in combination, the average dose of each should be reduced. The reference further states that in this manner toxic effects of large dosages of the individual components may be avoided and that combinations of drugs which produce the same end results but through different mechanisms of action, may thus give a combined effective action.

> The Sollman reference was cited to show that a desirable synergistic action may result from use of a combination of drugs wherein undesired side effects are not increased or are neutralized and enabling [sic] the corresponding dosage of each to be reduced.

The Drill reference teaches that there are three types of ACTH [4] in general use, one of which is a "long-acting, lyophilized ACTH in a gelatin menstruum for subcutaneous or intramuscular injection," and that the ACTH dosage in the form of a "long-acting gel" may be less than other forms for comparable effectiveness.[5]

Appellants' position, basically, is twofold. First, the combination of the two drugs is non-obvious since there is no teaching to combine these two out of all the known anti-inflammatory agents.[6] Second, and this is appellants' major position, the resultant combination product has greater potency or effectiveness than that expected on the basis of independent action of each component, i. e., the result is in appellants' terms "synergistic" which we read to mean that the results show unexpected synergism.[7]

---

3. The omitted portion of the sentence reads "and any results obtained therefrom would be inherent." We find that phrase particularly meaningless since the effect of drugs or reactivity of chemical compounds can be nothing else than "inherent." But inherency is not obviousness. See In re Adams, 356 F.2d 998, 53 CCPA ——.

4. Dorland's Illustrated Medical Dictionary, (23rd Ed., 1957) p. 30, defines ACTH as:
   ACTH, Adrenocorticotrophic hormone, elaborated by the anterior lobe of the pituitary gland, which influences the action of the adrenal cortex and causes the release of cortisone therefrom.

5. The U. S. Dispensatory reference describes one form of "My-B-Den," A5MP as available "in 10–ml. vials containing a sustained action vehicle (gelatin-base) with 20 mg. per ml. of adenosine-5-monophosphate (as the sodium salt)."

6. Appellants have included in their brief a statement that the 1963 edition of Physicians' Desk Reference shows more than 225 anti-inflammatory *products*, and for the treatment of bursitis approximately 140 *preparations* are listed, and 170 *therapeutic agents* are listed under the treatment of arthritis. That statement apparently is taken from a sworn letter of record by Mr. Gary L. Hein, President of Lincoln Laboratories, Inc., the assignee of the application here on appeal.

7. Both appellants' application and briefs, and the art of record contain various meanings for the term "synergism."
   Sollman defines "synergism" to mean the algebraic summation of desirable effects. Goodman terms this "summation." The opposite, algebraic summation of undesirable effects is termed "antagonism" by Sollman.
   Where the combined action is unexpectedly greater than the algebraic sum, it is termed "potentiation" by both Goodman and Sollman, or "supplemental synergism" (Sollman alone).

   The usual meaning appears to be that of Goodman, algebraic summation being termed summation or mere addition, and where the combined action is *greater* than the sum of the actions of the ingredients, the term "synergism" applies, In re Huellmantel, 324 F.2d 998, 51 CCPA 845; In re Luvisi, 342 F.2d 102, 52 CCPA 1063. What section 103 requires is "unexpected synergism," In re Huellmantel, supra, 324 F.2d at 1003, 51 CCPA at 850, the same

Concerning appellants' first position, we think it clear that it is a standard practice in this art to combine ingredients. Both the Goodman and Sollman references discuss in some detail the combination of drugs. The relevant part of Goodman states:

7. *Drug Combinations.* When drugs having the same type of action are given in combination, the average dose of each should be reduced. Certain terms are used to describe the various ways in which drugs may act together. When the combined effect of two drugs administered at the same time is equal to the algebraic sum of their individual effects the response is known as *summation.* It is sometimes advantageous to prescribe two synergistic drugs rather than a single agent. By this procedure, inasmuch as only a portion of the therapeutic dose of each is employed, it may be possible to obtain a greater margin of safety if the toxic effects of the individual components are exerted on different physiological systems or by a mechanism differing from that of the therapeutic action. Another advantage of drug combination is that drugs which produce the same end result may have entirely different mechanisms of action and in this way combine very effectively. Also two drugs having the same therapeutic effect may differ with respect to the rapidity of onset and duration of action. For example, if one drug has a rapid onset but short duration of action and another has a slow onset and prolonged duration of action, their synergistic action will be characterized by a rapid onset and long duration.

There are instances in which the combined action of two drugs is greater than that which can be anticipated from the sum of their individual actions. This is known as *potentiation.* For example, the administration of acid-forming saline diuretics prior to a mercurial diuretic results in a greater volume of urine than is predictable on the basis of individual effects.

Pertinent parts of the Sollman reference state:

*Combination Therapy.* * * * Combinations of drugs were formerly popular on the emperic principle of the shot-gun mixture—that of many ingredients, some at least might fit the disease. It is better to employ the fewest possible drugs, until it has actually been shown that combinations give superior results in the particular condition. In giving several drugs of similar actions, the dosage of each must be correspondingly reduced.

*Variations of Combined Action.* * * * Potentiation or supplemental synergism occurs only if the two agents have different points of attack in the cell. * * * [Investigators] have pointed out numerous important exceptions. It is certainly not universally applicable.

We are not convinced of non-obviousness of the combination of the two drugs, A5MP and a glucocorticoid such as hydrocortisone, for use as an anti-inflammatory composition, particularly since the record supports the solicitor's contention that the drugs selected are two of the commonly used drugs in the treatment of such collagen diseases.[8] See In re Huellmantel, supra.

as "potentiation" or "supplemental synergism" in the art of record here.

Thus we read appellants' second position to be that the results obtained upon the administration of the therapeutic composition demonstrate unexpected synergism in the reduction of dosage.

8. Appellants' evidence does not refute that view. Some 161 pages of the record are devoted to about 94 "Adenocort Case Reports" (some are duplicates) in which it is indicated that the following prepara-

tions were previously used to treat collagen disease conditions found amenable to "Adenocort" in the Case Reports: ACTH, Adenolin, Pablate, Calcium gluconate, Hypos. of Demerol/Phenergan [sic], Oral Codein/MS/Demerol, Tetracystine-Penicillin [sic], Sodium Salicylate-ASA Comp.-Arthropan Rela [sic], Betathiolin, Vitamins-Cod liver oil, Calcium, Sal-[unreadable], Hydrocortone TBA, Cortisone, Steroids, Buta-[unreadable], Protaxisol, My-[unreadable], Sigmagen, Madribon,

In our view then, the question of non-obviousness must turn on whether or not the prima facie case of obviousness of the composition comprising a combination of the two drugs is rebutted by a showing of unexpected results. Appellants' above-noted second position is directed to this point. In appellants' view, as stated in the specification, the combination is unexpectedly synergistic:

It has been discovered in accordance with the present invention that these two different types of therapeutic agents may be combined in proportions which complement each other. That is in the combination provided by the present invention the resultant products have greater potency or effectiveness than what would be expected based on their action independently. By reason of such mutual enhancement of activity it is possible to reduce the normal dosages required, especially that of the glucocorticoids. This is especially desirable since glucocorticoids such as prednisolone and hydrocortisone may have undesirable side effect.

For example, therapeutically effective and potent compositions for parenteral injection have been made in accordance with this invention wherein the dosage of prednisolone is as low as one-third of most available parenteral preparations.

As this court noted in In re Huellmantel, supra, 324 F.2d at 1003, 51 CCPA at 850:

As to properties, appellant argues that his composition exhibits unexpected synergism. Synergism is one factor to be considered in the ultimate determination of obviousness of the composition. However, we attribute no magic status to synergism per se since it may be expected or unexpected.
* * *

In our analysis, we need not decide whether any synergism, the combined effect being greater than the sum of the two parts, is either expected or unexpected, since it appears on this record that the existence of synergism has not been proved.

As a necessary preface to the discussion of synergism, we must decide whether some 94 "Adenocort Case Reports" may be considered as relevant to the establishment of the fact of synergism.

■ In In re Widmer, 353 F.2d 752 at 760, 53 CCPA ——, at ——, a case involving tests on an end product purporting to establish unexpected results for claimed intermediate compounds,[9] we stated:

* * * Clearly, the proffered evidence must run a greater risk of failing the relevancy test of admissibility in proportion to its remoteness from the claimed subject matter. Whether too remote is a question of law to be determined on the basis of the subject matter *as a whole*.

---

Delapyryn Succinate, Antocort [sic], Adenolin Forte, Soma, Extensive Rx, other medication, Papase, Darvon Comp., My-B-Den, Equanil plus other tranquilizers, Prem/Te-[unreadable], $B_{12}$-Vitamin B, Analgesics, and unknown medications. Additionally, the sworn letter of Hein, supra fn. 6, indicates:

* * * foreign protein, sulfur, gold, ACTH, cortisone type drugs, hydrocortisone, salicylates, enzymes, butazolidin type therapy, hydroxychloroquine preparations, and some of the newer steroids to mention a few * * *
are presently utilized in the treatment of collagen disorders.

Non-drug therapy listed was: Diathermy, Ultra Sound, and X-ray.

Even assuming each trade name above listed is for a distinct drug different from all the rest, and that the drugs were used only for the collagen diseases rather than for other conditions which some of the patients may have had, the list is considerably shorter than the 225 *products*, noted by appellants, and the components used by appellants in their combination are *so* often mentioned as to be significant members of that shorter list.

9. And the same is true for compositions, see In re Huellmantel, supra, 324 F.2d at 1002, 51 CCPA at 849.

We noted there that the test is whether one of ordinary skill in the art would reasonably ascribe to the compounds or composition claimed the contributing cause for the differences from the prior art of the tested compound or composition.

Here, the apparent risk of remoteness lies in the fact that the claims call for a composition comprising two ingredients, A5MP and a glucocorticoid, while the "Adenocort Case Reports," insofar as they can be taken as comparative tests, are tests of "Adenocort" as a composition containing five ingredients,[10] of which two are those claimed, and at least two others, niacin and the gelatin vehicle, could clearly be factors in the total therapeutic effect of the combination.[11] Nevertheless, it is clear from the record that but for the addition of a steroid component, the components of the "tested" composition, "Adenocort," are the same as those of a composition, "Adenolin," reported in the Case Reports as previously tried by many of the patients.[12] Thus the tested "Adenocort" is the prior used "Adenolin" plus a steroid.

It is against the reported relief obtained from "Adenolin" that the relief obtained from "Adenocort" is compared in certain of the Case Reports. Some of *the same* Case Reports, as well as others, show prior therapy with the glucocorticoid (steroid) component. Thus we are satisfied that one of ordinary skill in the art would ascribe to the combination of the *two* ingredients as claimed, the results obtained upon the administration of the *five-component* "Adenocort."[13] Those reports are thus admissible as probative of the fact of synergism. In re Widmer, supra; Deutsche Gold-Und Silber-Scheideanstalt Vormals Roessler

---

10. In an attachment to a sworn letter of Dr. Diamond, which attachment was submitted to the F. & D.A., the composition of "Adenocort" is stated to be:
COMPOSITION:
When suspended each cc. contains:

| | |
|---|---|
| Prednisolone Acetate | 10 mg. |
| Adenosine-5-Monophosphate | 25 mg. |
| Cyanocobalamin | 150 mcg. |
| Niacin | 10 mg. |

in a 17% aqueous Gelatin solution buffered with Sodium Hydroxide and preserved with 1.5% Benzyl Alcohol.
That composition is identical to that stated for the combination of Example 1 in the specification.

11. Regarding the gelatin vehicle, Mr. Hein, President of the assignee company, states his *opinion* in a sworn letter of record that:
* * * the gelatin menstruum has virtually no effect on the duration of action gained from the crystalline particles of prednisolone acetate suspended in it. It is therefore not correct to suggest that the use of the gelatin base has made possible the reduction in steroid dose.
Compare that statement with footnote 5 and accompanying text, supra.
The attachment to the sworn letter of Dr. Diamond describes the effect of the niacin component as follows:
Niacin as the amide derivative is a constituent of coenzymes I (DPN) and II (TPN), and the administration of niacin invariably increases the levels of DPN and TPN in the blood. DPN and TPN are mediators in cellular oxidation-reduction reactions vital to the liberation of energy from cellular foodstuffs: * * * Niacin also produces cutaneous vasodilation which increases blood flow in many parts of the body without affecting blood pressure. [Footnote omitted.]

12. The Physicians' Desk Reference, supra, discloses:
ADENOLIN
(ah den' o lin)
COMPOSITION: Each cc. contains 25 mg. Adenosine 5-Monophosphate, 150 mcg. Vitamin $B_{12}$ (cyanocobalamin) activity, and 10 mg. Niacin in 17% Gelatin Solution with 1.5% benzyl alcohol.
ACTION AND USES: Indicated in all types of inflammatory conditions, bursitis, tendinitis, neuritis, puritis, varicose vein complications, postphlebitic syndrome. * * *

13. The claims "comprising" the two components clearly cover the "Adenocort" composition. While it is true that "Adenocort" is not merely the two compound composition, it is equally true that the prior art did not in fact use the glucocorticoid or A5MP alone, as evidenced by the "Adenolin" formula, footnote 12, supra. The characterization of the issue as whether or not the composition of a combination of the *two* components is obvious is still accurate.

v. Com'r of Pats., 251 F.Supp. 624, (D.C. D.C.1966).

We come then to the dispositive point of this case, whether the claimed composition, in fact, exhibits synergism in dosage reduction. Upon a review of the record, representative portions of which follow, we are constrained to believe that appellants have not shown synergism.

As noted above, appellants' specification states that the products of the claimed combination "have greater potency or effectiveness than what would be expected based on their action independently." It is also stated that "it is possible to reduce the normal dosages required, especially that of the glucocorticoids."

The examiner stated in the final rejection:

> Contrary to applicants' allegation, the composition has not been shown to result in a diminution of steroidal dosage beyond that expected with the use, concomitantly, of a non-steroidal anti-inflammatory agent. * * *

There are no remarks of record by appellants in response to the final rejection. A subsequent amendment of appellants' added specific claims naming each component of the "Adenocort" composition (not entered or on appeal here). In a letter in response thereto the examiner stated:

> * * * Applicants' argument for the latter [unexpected] results are based upon an allegation of reduced dosage and reduced side effects beyond that normally expected. However, the evidence of record does not substantiate such allegation. Applicants compare the dosage of the instant composition with the dosage of a short acting steroid. However, it must be noted that the instant steroid is given in a *gelatin* menstruum, which protracts its action and invariably reduces its dosage. Hence, the conclusion of reduced dosage is not based upon a valid comparison.

In the examiner's answer, the Patent Office view was stated thus (all emphasis in the original):

> Although applicants also administer their composition orally, no such allegation of a 50% reduction in dosage is asserted for the oral preparation. This much quoted 50% figure is derived solely from comparisons of *recommended* parenteral dosage. Note pages 1, 2 and 5 of the submitted Exhibit [first series of "Adenocort Case Reports"].

> It should also be noted that this " * * * recommended dose * * ", which asserts in effect that when the instant steroid—ATP [sic: A5MP] composition is administered, only 50% of the amount of steriod is required by the patient as compared with prior art steroids alone, and at least equal effect is obtained from the instant composition, is based upon the Exhibit and the cases contained therein for proof. Extremely close analysis of this Exhibit, submitted by a co-applicant, Dr. Diamond, fails to prove, *in any manner,* that the instant composition reduces the amount of steroid required by any patient; rather the cases show an *increase* in a steroid dosage resulted from the use of the instant composition as compared with previously administered glucocorticoids.

> Of the 14 cases submitted only three cases actually set out any information on the actual doses of prior art steroids administered so as to permit an actual comparison of the amount of each steroid with the instant composition. However, it is felt that these three cases are sufficiently representative to permit some conclusion to be drawn. Because of the very complicated dosage computations and the paucity of such information supplied by applicants, the Examiner has summarized the net effect in each of these cases.

> Case Report No. 1, page 8, H.L. The prior art steroid was administered over a four week period for a total dose of 80 mg. The instant composition was administered for two weeks for a total dosage of 120 mg. This case demon-

strates a *50% increase in steroid* administered in the form of the instant composition.

Case Report No. 3, page 16, M.K.J. The prior art steroid and the instant steroid were given in equivalent dosage, *but* the instant composition was supplemented by ultrasonic therapy. Hence, *no reduction* in dose whatever is shown.

Case Report No. 3, page 17, L.F. Prior art steroid given for 4 weeks for a total of 90 mg. glucocorticoid. The instant composition given for 5 weeks for a total of 140 mg. steroid. The case shows a *56% increase* in steroid dosage resulted from the administration of the instant composition.

Therefore, it appears that the allegation of reduced dosage, urged as the basis of unobvious and unexpected results, has never been proved and careful examination of the cases submitted proves the reverse to be true. But even conceding some reduction in dosage, it is not apparent that in view of the reductions predicated on the basis of combined drug therapy or the employment of a gelatin menstruum that such reduction could serve as the basis of patentability.

In a "Letter to Office" appellants requested additional time to file a reply brief, noting new references cited, and stating, inter alia:

\* \* \* In the Examiner's Answer, for the first time, specific criticisms were made with regard to the case histories of patients which had been submitted by appellants in their response to the Examiner's first Official Action. The Examiner rendered two Official Actions after appellants had submitted their case histories but in neither did he criticize or question the case histories on the grounds now contended in the Examiner's Answer.

The request was granted and sworn letters accompanied by 80 additional "Adenocort Case Reports" were submitted. The relevant portion of the letters states:

2. *The Section of Sterane (prednisolone acetate Pfizer) for Dosage Comparison—*

It appears that the Examiner criticized our selection of Sterane (prednisolone acetate) as a standard reference by which ADENOCORT should be compared. This was a perfectly legitimate selection in that Pfizer's Sterane represents the most widely accepted and well established dosage form for prednisolone acetate injection. As a matter of fact, the Food and Drug Administration suggested to our Dr. Diamond during a phone conversation that Sterane be used as a positive control in carrying out our animal toxicity studies with ADENOCORT. The dosage schedule for injectable prednisolone acetate established by Pfizer has been widely followed by other prednisolone acetate products here and abroad.

Of the 80 additional case reports only 4 appear to note anything about dosages of "Other" or "Previous" drug therapy. In 2 of the 4, cases B–12 and B–14, wherein "ASA comp" and "Rela" respectively, were given previously, the dosages are "gr x q 4 h" and "II pc & hs." In a third, case B–16, "analgesic" was given in "large" dosage. In case B–44, "Other Drug Therapy" is listed as "BENIMIDE [sic: Benemid] 0.25 mg. b. i. d. x 7 days then 0.25 mg. daily." The dosage of "Adenocort" in almost all of the cases was 2 cc. intramuscularly every other day for two weeks, for a total of 7 or 8 injections. "Benemid," also termed "Probenecid" according to The Merck Index, 6th Ed., p. 789 (1952) is "p-(di-propyl-sulfamyl) benzoic acid," "ASA comp," an aspirin, phenacetin, caffein and codein compound, and "Rela," each tablet of which contains 350 mg. of carisoprodol, are neither A5MP nor a glucocorticoid.

The board affirmed the rejection for its own reasons "and those set forth in the Examiner's Answer \* \* \*." In the Brief on Appeal here, appellants *do argue* as they argued below, that the examiner erred in stating that the reduction in dosage stemmed from the use of gelatin menstruum. That point of the

examiner regarding gelatin as the expected cause of any enhanced activity leading to reduced dosages constituted one paragraph of the answer, while the immediately succeeding 7 paragraphs (2 pages) above quoted, challenging the fact of reduction in dosage, has gone unrebutted on this record.

It is clear from the above that the Patent Office view was that there was no synergism evidenced by the dosages listed in the first set of Case Reports submitted by appellants, and that, assuming arguendo, there was, that it was due to the gelatin vehicle. Appellants' response was confined to the latter point. We assume, arguendo, that appellants' response proves the gelatin vehicle not to be the cause of any synergism, but we are compelled to affirm the decision of the board as to claims 1–14, since the examiner's prima facie accurate analysis as to the proofs submitted on the fact of synergism in the dosages has gone unrebutted on this record.

Affirmed.

SMITH, J., concurs in the result.