53 CCPA

**Application of Alan J. LEMIN.**
**Patent Appeal No. 7580.**

United States Court of Customs and Patent Appeals.

July 28, 1966.

George T. Johannesen, Kalamazoo, Mich. (Eugene O. Retter, Kalamazoo, Mich., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Irving R. Pellman, Washington, D. C.,

---

of counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

RICH, Acting Chief Judge.

This appeal is from the decision of the Patent Office Board of Appeals,[1] adhered to on reconsideration, affirming the examiner's rejection of process claims 3–5 and composition claims 6–10 in application serial No. 32,518, filed May 31, 1960, for "Organic Compounds and Process."

The invention is directed to a new use of an old compound and its position isomer. Appellant has found that α-ethynyl-1-naphthalenemethanol and α-ethynyl-2-naphthalenemethanol are active against plant pathogenic fungi and that, when applied to seeds or to the soil in which the seeds are planted, effective control of the fungi is obtained. Claims 3 and 6 are illustrative:

3. A process for the control of fungal infestations of seeds and of soil which comprises applying to the locus to be treated a fungicidally effective amount of a compound selected from the class consisting of α-ethynyl-1-naphthalenemethanol and α-ethynyl-2-naphthalenemethanol.

6. A fungicidal composition which comprises a fungicidally effective amount of a compound selected from the class consisting of α-ethynyl-1-naphthalenemethanol and α-ethynyl-2-naphthalenemethanol dispersed in a carrier consisting of water containing a surfactant.

Claim 4 is directed to a process in which the chemical is applied to the seeds

---

[*] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

[1] Consisting of Examiners-in-Chief Federico and Rosa and Acting Examiner-in-Chief Stone, the latter writing the opinion.

either before or after planting; claim 5 to a process in which the chemical is applied to the soil. Claim 7 is directed to an emulsifiable concentrate which comprises a surfactant, a water-immiscible solvent, and a fungicidally effective amount of the compound; claim 8 to a concentrate adapted to form an aqueous dispersion on dilution with water which comprises a surfactant, a water-miscible solvent, and a fungicidally effective amount of the compound; claim 9 to a dispersible powder which comprises a surfactant, an inert solid diluent, and a fungicidally effective amount of the compound; and claim 10 to a dusting powder which comprises an inert solid diluent and a fungicidally effective amount of the compound. Concentrations of 500 to 10,000 parts per million are contemplated when using aqueous dispersions or oil-in-water emulsions for the treatment of soil.

The claims were rejected as unpatentable over:

> Tanaka et al., "Antibiotics and Chemotherapy, Volume 9, pp. 151–155 (March 1959)

The sole issue, simple to state but not so easily resolved, is: does this reference teach or suggest to one of ordinary skill in the biochemical art that α-ethynyl-1-naphthalenemethanol would control plant pathogenic fungi on seeds or in soil? More specifically, the question is what certain terms used in the reference actually mean. The parties are in total disagreement on this question.

Tanaka et al. disclose tests of certain synthetic acetylenic compounds performed by an agar streak two-fold serial dilution technique using sometimes two and sometimes three fungi, and two bacteria, as test microorganisms. Among those compounds tested is one of the two used by appellant as the active ingredient,

α-ethynyl-1-naphthalenemethanol. The 2-naphthalene compound used by appellant is not disclosed in the reference and will not be discussed further since no claim is limited thereto. Each compound of the reference, dissolved first in acetone in adequate concentration, was diluted with the agar medium to the final concentration. One of the test fungi, *Piricularia oryzae,* is admittedly a pathogen to the rice plant.

The test results are reported as "minimal concentrations," expressed as µg/ml,[2] "required for complete inhibition." As to each of the four species, including *P. oryzae,* upon which the 1-naphthalene compound was tested, the symbol " > 50" is used to report the test results.[3] It is over the interpretation to be given this expression that the dispute arises.

The gist of the Patent Office position is that Tanaka et al. say, in effect, that the compound *has* antifungal activity because the expression " > 50" means, in the context used, that at some concentration greater than 50 µg/ml the compound gives "complete inhibition" of the microorganisms treated. The board, furthermore, felt "that the mere disclosure in the reference of testing the compound α-ethynyl-1-naphthalenemethanol as a fungicide renders the reference applicable against the instant claims," and, while passing over the *results* of those tests and the significance thereof except to express disagreement with appellant's argument that they show the compound *lacks* fungicidal activity, concluded that "To use a higher concentration of the fungicide and find it is effective as such, is believed to be within the skill of the art and not patentable.

Appellant contends there is no basis in law or in fact to support the board's position—that the symbol " > " is a conventional designation in this kind of test reporting and what it *actually means* to

---

2. 1 µg/ml corresponds to 1 part per million.

3. For a better understanding of the form of reporting in the tables of the reference, an example of a compound showing complete effectiveness on some of the five test microorganisms in terms of the minimal concentrations (µg/ml) is this:

| [compound] | 3 | 1.6 | 6 | > 50 | > 50 |

The test on applicant's compound reads thus, in four columns:

| [compound] | > 50 | > 50 | > 50 | > 50 |

one of ordinary skill in *this* art is simply that the compound tested was ineffective *at the highest concentration tested,* here 50 µg/ml. Thus, appellant insists the reference says nothing at all, even by implication, about whether the compound is or would be effective at concentrations above 50 µg/ml, or whether Tanaka et al. found *some* inhibition at 50 µg/ml or less, an alleged fact the solicitor asks us to assume. Finally, appellant points out that Tanaka et al. themselves, obviously workers skilled in this art, call another compound which exhibited "complete inhibition" at 25 µg/ml "ineffective," and, that being so, one of ordinary skill in this art would certainly not be directed toward using a compound found to be ineffective at 50 µg/ml.

Appellant's case is based on two affidavits, which, because of the significance we attach thereto, are set out in full. The first affidavit submitted to the examiner and therefore before the board, reads:

LIONEL E. RHULAND, being duly sworn, deposes and says:

THAT, he is a bacteriologist having received the degree of Doctor of Philosophy in Bacteriology from the University of Indiana in 1951;

THAT, since 1951 he has been in the continuous employ of The Upjohn Company and is currently Research Manager of the Infectious Diseases Division of the Research Department of said company;

THAT, he has long experience in the testing of compounds for bactericidal and fungicidal activity and in the reporting and analyzing of data derived from said testing;

THAT, he has read and is familiar with the paper of Tanaka et al. published in Antibiotics and Chemotherapy, *9*, 151–155;

THAT, in Table III on page 153 of the aforesaid paper there appears in tabulated form the results of testing a number of acetylenic compounds against two species (T. asteroides and P. oryzae) of fungi and two species (E. coli and B. subtilis) of bacteria;

THAT, the notation " $_v$ 50" which is shown as the result recorded against all four of said microorganisms in said Table III for the compound α-ethynyl-1-naphthalenemethanol (third compound) means, according to convention universally used in the reporting of such results, that the compound was tested in concentrations up to and including 50 µg/ml. and was found to be inactive at all such concentrations;

THAT, the paragraph immediately under Table III on page 153 of said paper states that all the active compounds, with the exception of one (l-naphthyl-l-oxo-hexa-2,-4 diyne; activity against B. subtilis recorded as 6 µg/ml. in Table II), were inactive against bacteria;

THAT, in reporting the results of testing of said compounds against bacteria the authors used the notation " >50" in all cases except one, namely that of compound 6 in Table II where the notation "25" appears; and

THAT, accordingly, the authors are employing the term " >50" in accordance with normal convention as meaning no activity when tested in concentrations up to and including 50 µg/ml.

FURTHER, deponent sayeth not.

The second affidavit, filed after the first board decision with a request to remand but treated by the board as a request for reconsideration, reads:

LIONEL E. RHULAND, being duly sworn, deposes and says:

THAT, I am the Lionel E. Rhuland who on January 14, 1963 executed an affidavit in the above-identified application in regard to a paper of Tanaka et al. published in Antibiotics and Chemotherapy, *9*, 151–155; and thus being qualified further depose and say as follows:

I have again reviewed the data given by Tanaka et al. and reaffirm that there is no evidence of any activity against fungi for compounds in question. All that the symbol " >" means is that the compounds were not active, i. e., did not give complete inhibition,

at the highest concentration tested. It does not mean or imply that the compounds in question were partially active at the highest concentration tested. Thus the paper conveys no information whatever indicating fungicidal activity for the compounds in question, complete nor partial.

Furthermore, if the compounds in question actually gave partial inhibition at the highest concentrations tested, this fact either was not observed by the authors or was deliberately withheld by the authors. In either case information to this effect is not communicated to me, and would not be communicated to any other persons skilled in the art by the paper.

FURTHER, deponent sayeth not.

The decisive question is whether appellant or the Patent Office gives to the expression " > 50" a meaning corresponding to that used by workers in this field, for it is that interpretation which determines what information the reference conveys to one of ordinary skill in the art. It is this question of *fact* which controls the ultimate *legal* issue of whether the invention would have been obvious within the meaning of 35 U.S.C. § 103.

We think the affidavits speak for themselves. While the examiner is presumed to be an expert in his field of examination, and while, in the absence of instruction, we might be inclined to agree with him that " >50" would seem to mean positive activity at some unknown concentration above 50 µg/ml, we must, in making determinations under section 103, give weight to the sworn statements of workers skilled in the art as to the meaning to them of symbols with which they, and not we, are familiar. This is particularly so when, as here, questions of convention and custom come into dispute. Having considered these statements, together with the arguments of the examiner, the board, and the solicitor, and noting the absence of any refutation of the factual statements in the affidavits on the part of the Patent Office, we accept the statements as to what the Tanaka et al. article discloses to one of ordinary skill in this art. Accepting it, we must find that it does not render the claimed invention obvious.

We see no merit in the Patent Office argument that the affidavits express mere opinions and do not state facts.

Further, as to the contention that Tanaka et al. *might* have observed *some* activity at the various concentrations used, our answer is that we are not concerned with what Tanaka et al. might have observed, but only with what they in fact reported and with what this would mean to one of ordinary skill in the art.

Accepting, as we do, appellant's interpretation of the reference on the basis of unrefuted affidavits reciting the technical meaning of the symbology employed, we are of the opinion that the sole reference teaches nothing whatever about the properties, the discovery of which underlies the claimed inventions.

The board, on rehearing, said, *"To use a higher concentration of the fungicide and find it is effective as such, is believed to be within the skill of the art and not patentable."* (Our emphasis.) This is tantamount to saying that those skilled in the art could discover what appellant discovered by doing what he did. This is unquestionably so, but the issue under the law is whether it would be *obvious* to do what he did. A reference which shows to workers in the field only that a compound is not effective up to 50 µg/ml. (and we so interpret it) is not a basis on which we can find obviousness.

The decision of the board is reversed.

Reversed.

MARTIN, Judge (concurring).

I agree with the views expressed in Judge SMITH's concurring opinion. In addition, it is my view that the affidavit only *prima facie* show that the convention in this art would lead to an interpretation of the Tanaka disclosure as teaching that the compound was tested at 50 µg./ml. and did not give complete inhibition, and also that no information on partial inhibition was conveyed. That

still leaves in my mind a close question of whether or not the use of the compound at higher, "fungicidally effective," amounts or the composition of the compound in the usual carriers is obvious. Although it is not clear, the majority appears to view the Tanaka reference as teaching away from the claimed invention(s). However, I resolve the doubt, and it is considerable in the case of the composition claims, in favor of appellant.

SMITH, Judge (concurring), with whom MARTIN, Judge, joins.

Absent the affidavits I would give full credence to the statements in the reference relied on by the Patent Office. These statements are as follows:

# Antifungal Activity of Some Synthetic Acetylenic Compounds

KIICHIRO TANAKA, ISSEI IWAI, YAKUTARO OKAJIMA, AND TAKUO KONOTSUNE

*Takamine Laboratory, Sankyo Co., Ltd., Tokyo, Japan*

Capillin, 1-phenyl-1-oxo-hexa-2, 4-diyne, which was isolated in our laboratory a few years ago from the essential oil of *Artemisia capillaris Thunb.*, has been reported to have high antifungal activity.[1]

Using procedures of synthesis described elsewhere,[2,3] we have recently prepared compounds related to capillin having the following general formulae:

$$R_1 - CO - (C \equiv C)_n - R_2 \qquad (I)$$
$$R_1 - CH(OH) - (C \equiv C)_n - R_2 \quad (II) \qquad (n = 1 \text{ or } 2)$$

In the present paper we wish to report some results of our investigations on the antimicrobial activity of these compounds.

## METHODS

The tests were performed by the agar streak dilution technique using three fungi and two bacteria as test microorganisms.

Each compound, dissolved first in acetone in adequate concentration, was diluted with the culture medium to the final concentration. In all cases the final concentration of acetone was less than 0.5 per cent.

The culture conditions for the test microorganisms are shown in table I.

The antimicrobial activity of each compound was expressed by the minimal concentration required for complete inhibition of the test organism after the incubation period.

## TABLE III

Minimal Concentrations (μg./ml.) of Compounds Represented by the General Formula
$R_1 — CH(OH) — (C \equiv C)_n — R_2$ (II) Required for Complete Inhibition of
4 Species of Microorganisms

| | Test organism | | | | |
| Compound | T. asteroides | P. oryzae | E. coli | B. subtilis | |
| --- | --- | --- | --- | --- | --- |
| (phenyl)—CH(OH)—C≡CH | >50 | >50 | >50 | >50 | |
| (phenyl)—CH(OH)—C≡C—CH₃ | >50 | >50 | >50 | >50 | |
| (naphthyl)—CH(OH)—C≡CH | >50 | >50 | >50 | >50 | [1] |
| (phenyl)—CH(OH)—C≡C—C₄H₉ | >25 | >25 | >50 | >50 | [2] |
| (phenyl)—CH(OH)—C≡C—C≡C—CH₃ | >50 | >50 | >50 | >50 | |
| (phenyl)—CH(OH)—C≡C—C≡C—C₂H₅ | 50 | >50 | >50 | >50 | |
| (phenyl)—CH(OH)—C≡C—C≡C—CH₃  OH | >50 | >50 | >50 | >50 | |
| (naphthyl)—CH(OH)—C≡C—C≡C—CH₃ | 6 | >50 | >50 | >50 | |

The above statements appear to teach that compounds related to capillin, which has been reported to have high antifungal activity, were tested for antimicrobial activity and the "*Minimal* Concentrations * * * Required for *Complete* Inhibition of 4 Species of Microorganisms" is greater than 50 and 25 μg./ml. respectively for the two compounds identified above concerning the P. oryzae species. [Emphasis added.]

However, what appears to be clearly taught by the reference must be qualified according to appellant's affidavits. The first affidavit states in the singularly important part that "the notation ' > 50' " means "according to *convention universally* used in the reporting of such results that the compound * * * was found to be *inactive* at all such concentrations," and this is "*normal convention * * ** meaning *no activity* when tested

in concentrations up to and including 50 µg./ml." [Emphasis added.]

The second affidavit states the greater than symbol means "the compounds were not active, i. e., did not give *complete inhibition,* at the highest concentration tested." I do not find this statement to be contrary to the statements of the reference.

If this was all the affidavits stated, it is at once apparent that they support the position of the Patent Office. However, there is a sentence in the second affidavit which states, the greater than symbol "does not *mean or imply* that the compounds in question were *partially active* at the highest concentration tested." [Emphasis added.]

It is clear that the above sentence is the strength upon which appellant's case stands or falls. It seems to me that appellant has taken the position by introducing the affidavit that the reference teaches *no inhibition* against any of the test organisms set forth where the greater than symbol is employed.

We are here dealing with a question of *fact* as to what the above symbol conveys to one of ordinary skill in the art. While appellant has offered only affidavit proof to establish this very important fact, vital to appellant's case, I find from the record that the Patent Office has continuously avoided consideration of the fact averred in the affidavit. Where an applicant fails to respond to a fact averred by the Patent Office, we have accepted that fact as established in .our determination under section 103. See In re Boe, 355 F.2d 961, —— C.C.P.A. ——; In re Diamond, 360 F.2d 214, —— C.C.P.A. ——.

Here I find from the facts of record the reference teaches one of ordinary skill that there is no inhibition whereever the greater than symbol is used. I must conclude that the claimed processes and compositions are non-obvious within the meaning of section 103. For the above reasons I would reverse the decision of the board.