Peter M. ROBERTS, Plaintiff-Appellee,

v.

SEARS, ROEBUCK & CO.,
Defendant-Appellant.

No. 82–1886.

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1983.

Decided Dec. 21, 1983.

Rehearings Denied Feb. 22, 1984.

James G. Hunter, Jr., Latham, Watkins, Hedlund, Hunter & Lynch, Chicago, Ill., for defendant-appellant.

Louis G. Davidson, John B. Davidson, Sidney Neuman, Harry J. Roper, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and BAUER, WOOD, CUDAHY, ESCHBACH, POSNER, and COFFEY, Circuit Judges.*

HARLINGTON WOOD, Jr., Circuit Judge.**

After years of interesting struggles with patent issues under the tutelage of the distinguished patent bar in this Circuit, this court, by reason of the Federal Courts Improvement Act of 1982, soon must leave these appellate issues to the experts of the United States Court of Appeals for the Federal Circuit.[1] Our view of patent matters therefore will be of little future consequence; nevertheless, we hope to leave the field in good standing.

In a jury trial in the district court, plaintiff Roberts' patent was found to be valid and infringed; judgment was entered in his favor in an amount in excess of eight million dollars. On appeal, the original panel, in a concise opinion authored by Judge Posner, concluded the patent was invalid as obvious, reversed the district court, and directed that the case be dismissed. This court determined that the case required *en banc* consideration. A majority now reaches a conclusion at variance with that of the original panel. At issue is the oftentimes confused role of the jury in a patent infringement action in which the invalidity of the patent in suit is raised as an affirmative defense.

I

Those of us who have experimented, not always successfully, with the "do-it-yourself" approach to car or bicycle repairs may have had occasion to use a conventional socket wrench. When we were able to tell the nut from the bolt, wished to remove the former, and had located the socket of the correct size, the problem became how to remove the socket then attached to the wrench. After pulling, prying, muttering, and more pulling, the two-handed operation was completed. Plaintiff Peter Roberts, having personally experienced such frustration, addressed himself to that problem; in 1963, he designed and constructed a prototype socket wrench with a quick-release feature that permitted its user to facilely change sockets with one hand without the customary pulling, prying, and muttering. Roberts filed an application for a United States patent on the wrench in April, 1964,[2] which was rejected in March, 1965. He then extensively amended his application and presented a single claim[3] upon which a

* Judge Pell and Judge Flaum did not participate in the consideration of this case.

** We hereby acknowledge the brief of *amicus curiae* National Business Systems, Inc.

1. The Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 125(a)(3), 96 Stat. 36, repealed 28 U.S.C. § 1292(a)(4), the basis for this court's appellate jurisdiction of judgments "in civil actions for patent infringement which are final except for accounting." Although this jurisdiction now lies in the United States Court of Appeals for the Federal Circuit, 28 U.S.C. § 1292(c)(2), we retain jurisdiction of patent cases, such as this, in which notice of appeal was filed before October 1, 1982. *See* Pub.L. No. 97–164, §§ 402, 403(e), 96 Stat. 57, 58.

2. Roberts, an employee of Sears at the time, decided to show his invention to the store manager; he ultimately was persuaded to formally submit his invention as a "suggestion" to Sears in May, 1964. Shortly thereafter, Roberts left Sears' employ.

3. Sears took steps to ascertain the utility, value, and patentability of the invention, with positive results. In April, 1965, outside patent counsel advised Sears that there was "some basis for limited patentability." *Roberts v. Sears, Roebuck & Co.,* 573 F.2d 976, 979 (7th Cir.1978). In May, 1965, the Patent Office indicated it would issue the Roberts patent. Roberts, uninformed that a patent would issue, entered into negotiations with fully-informed Sears concerning Sears' purchase of rights to use Roberts' invention. Roberts ultimately was induced to assign all rights to his invention in return for a two-cent royalty per unit sold up to

patent formally was issued on September 28, 1965.

Defendant Sears, the assignee of all rights to Roberts' patent, mounted an advertising campaign which explained, in layman's terms, the principal advantage of Roberts' claimed invention: "Push-button ratchet wrench releases without a fight. Ever tried to separate a socket from an ordinary ratchet wrench when your hands were greasy? Forget it. You just press a button on Sears new Craftsman wrench. They separate easily—no yanking." Roberts' quick-release wrench was an enormous commercial success.

In 1969, Roberts sued Sears alleging, *inter alia,* that he was fraudulently induced to assign his rights to the invention to Sears. The jury awarded Roberts one million dollars in damages. This court affirmed the district court's judgment against Sears and its decision not to alter Roberts' monetary award, but reversed the district court's determination that it lacked authority to order rescission of the agreement assigning Roberts' rights to Sears. *Roberts v. Sears, Roebuck & Co.,* 573 F.2d 976, 986 (7th Cir. 1978) (*Sears I*).

Following the remand, Sears prepared, executed, and tendered to Roberts, through the district court, reassignment of any and all rights in the patent obtained pursuant to the June 15, 1965, agreement, the sole equitable relief anticipated by this court in *Sears I.* The district court, however, further ordered the entire case reopened for an accounting of Sears' "unjust enrichment" from June 15, 1965. On appeal, this court held that because Roberts had elected to submit his damage claim to a jury, he was precluded from pursuing the equitable remedy of restitution for "unjust enrichment." *Roberts v. Sears, Roebuck & Co.,* 617 F.2d 460, 465 (7th Cir.1980).

This court further held that Sears was the lawful owner of all patent rights from June 15, 1965, to January 20, 1977, when Roberts, through reassignment, became the

lawful owner of all patent rights. We stated that Roberts would be entitled to sue only for infringement occurring after January 20, 1977. Although Sears was precluded from challenging the validity of the patent in the first trial, we made clear that Sears could do so if sued by Roberts for post-January 20, 1977, infringement. *Id.*

And it came to pass. Roberts instituted an infringement suit against Sears, which defended on the ground that the patent was invalid as both anticipated and obvious. Roberts demanded a jury trial, which was bifurcated at Sears' request. Following a five-day trial on the issues of infringement, willful infringement, and validity, the jury was instructed on the relevant substantive law and given five "special verdict" forms to be answered "yes" or "no" pursuant to Fed.R.Civ.P. 49. They read as follows:

(1) We, the jury, find that the defendant willfully infringed the Roberts patent by selling the Roberts type wrenches after January 1977.

(2) We, the jury, find that the Orszulak or Z type design which defendant started to sell in 1980 infringes the Roberts patent in suit.

(3) We, the jury, find that the defendant willfully infringed the Roberts patent by selling the Orszulak or Z type wrenches after January 1977.

(4) We, the jury, find the Roberts patent is new and not anticipated by the Carpenter patent or the Gonzalez patent.

(5) We, the jury, find that the subject matter of the Roberts patent considered as a whole was not obvious to one of ordinary skill in the art in the years 1963–64.

All but special verdict number three were answered affirmatively by the jury. Number three is not now an issue. A two-day trial on the issue of damages followed, resulting in a jury award for Roberts of five million dollars.

a maximum of $10,000. *Id.* An agreement encompassing these terms was signed by Roberts on June 15, 1965.

The district court composed no findings of its own. Instead, on Roberts' motion, the district court entered an order adopting as its findings the affirmatively answered special verdicts rendered by the jury finding the Roberts patent not to have been anticipated or obvious, and to have been infringed. The district court concluded that the Roberts patent "is good and valid in law." The damage award for willful infringement of the Roberts patent by sale of the Roberts-type wrench was increased by a factor of two, bringing the total award to $8,190,254.[4] The district court permanently enjoined Sears from making, using, or selling the infringing wrenches through September 28, 1982, the Roberts patent expiration date. Sears' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial was denied.

Sears appealed, contending, *inter alia,* the Roberts patent was invalid because its claim was anticipated by, and further would have been obvious in light of, prior art references not before the patent examiner. Sears also claimed the district court erred in submitting to the jury the "legal questions" of obviousness and anticipation. The three-judge panel of this court reversed the district court's judgment based on the jury verdict, reached its own contrary conclusion that the patent was invalid for obviousness, and directed that the complaint be dismissed. *Roberts v. Sears, Roebuck & Co.,* 697 F.2d 796 (7th Cir.1983). Roberts' petition for rehearing with suggestion for rehearing *en banc* was granted, and the panel decision was vacated by order dated March 14, 1983.

We find it necessary to address only one issue: whether the jury instructions and procedure utilized mandate reversal of the judgment and remand for a new trial. We premise our discussion of this issue with a review of relevant patent principles.

## II

Article I, § 8, cl. 8 of the Constitution empowers Congress "to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right[5] to their re-

---

4. 35 U.S.C. § 284 provides: "When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed." Although the decision to increase the damage award is discretionary with the trial court, this discretion ordinarily should be exercised only in cases of willful infringement or bad faith litigation. *See generally* 5 D. CHISUM, PATENTS § 20.03[4][b] (1983).

5. One eminent jurist, the Honorable Howard T. Markey, formerly Chief Judge of the United States Court of Customs and Patent Appeals and presently Chief Judge of the United States Court of Appeals for the Federal Circuit, recently suggested that a patent is not to be equated with a monopoly, a term that appears nowhere in the patent statute. "Why Not the Statute?", Address by Chief Judge Howard T. Markey, University of Chicago Law School (April 26, 1983). 35 U.S.C. § 154 defines a patent as a seventeen-year grant of "the right to exclude others from making, using, or selling the invention." 35 U.S.C. § 261 specifies that "patents shall have the attributes of personal property." Chief Judge Markey suggests that the right to exclude others is "but a pseudonym for 'property.'" Of course, it is possible to use any property in a scheme to violate the antitrust laws. "Similarly, attempted enforcement of a fraudulently procured patent may constitute a violation of the antitrust laws." In such a context, the term "monopoly" applies to the unlawful conduct, not to the patent right itself. In Chief Judge Markey's view, the inventor has a "natural monopoly" at the moment the invention is conceived. The genius of the patent system is that disclosure of the invention is encouraged; the inventor cedes his natural monopoly in exchange for a short-term property right.

We note that whether a patent is equated with a monopoly, a term we concede is used loosely in many cases, is important only insofar as the equation produces an economic analysis of patent validity in direct conflict with the statute, which provides that "[p]atentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103. The original panel opinion in this case, as we understand it, suggested that obviousness is to be determined, at least in part, by reference to certain economic considerations, an analysis with which we have some disagreement; to be fairly considered, the following selected extracts should be read in the context of the entire original opinion.

We are not prepared to state for the purposes of this case that "[a] patent confers a monopoly over the products in which the patented idea is embodied, and monopoly, among its other

spective writings and Discoveries." In the exercise of this power, Congress enacted the Patent Act of 1952 (the Act), 35 U.S.C. § 1

effects, results in a lower output of the monopolized product and so reduces consumer welfare."

Nor are we prepared to determine that "[t]he framers of the Constitution and the Patent Code would not have wanted patents to be granted where the invention would have been made anyway, and about as soon, without any hope of patent protection. The grant of a patent in such a case would confer no benefits that might offset the costs of monopoly."

We do not believe the recognized test of obviousness can be simply stated as "[t]he concept of obviousness identifies such inventions—inventions that do not cost much in time or other resources to make because existing products or processes embody most of the information that constitutes the invention—and denies them patent protection."

Nor would we deny patentability solely because "Roberts' quick-release mechanism is simplicity itself and as one would expect its essential elements were well known when it was invented." The panel opinion stated that "[w]hat was new was a device in which these ideas worked smoothly to enable sockets to be changed easily with one hand." We have no quarrel with that statement; however, the panel opinion proceeds to suggest a test which we are not prepared to adopt: "[t]hat was Roberts' contribution, and it was genuine, but it was entitled to patent protection only if it was the kind of contribution unlikely to be induced except by the promise of a monopoly, and we do not think it was that kind of invention, because we think it would have been made anyway, and soon."

Nor do we believe the determination of obviousness turns on whether "[i]t was just a question of coming up with a workable embodiment of these ideas, a task for which no special training, expensive equipment, or prolonged testing and refining were necessary."

Finally, we are not prepared to make the judgment that "[p]atent protection would overcompensate the inventor in these circumstances and by so doing would both draw excessive resources into the making of minor improvements and impose unnecessary costs of monopoly on the community." *Roberts v. Sears, Roebuck & Co.*, 697 F.2d at 797–98.

Even if the record in this case supported these judgments, we do not believe they are ours to make. Congress has declared that the manner in which an invention is made may not defeat patentability. We disavow any test of obviousness that is inconsistent with this clear expression of congressional intent.

**6.** In *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979),

*et seq.*[6] The Act sets forth three criteria of patentability: novelty, utility, and nonobviousness.[7] *Graham v. John Deere Co.*, 383

the Supreme Court explained the purposes of the Act:

First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions, to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

**7.** 35 U.S.C. § 101, a general statement of the type of subject matter that is eligible for patent protection, provides that:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 102, which describes the statutory novelty required for patentability, provides in pertinent part that:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

\* \* \* \* \* \*

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 103, which sets forth the nonobviousness requirement for patentability, provides that:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). In a patent infringement suit, the defendant may challenge successfully the validity of the plaintiff's patent or any claim thereof by proving that any one of these three conditions of patentability was not satisfied; if the patent is proved invalid, the infringement issue is not reached. *Moore v. Wesbar Corp.*, 701 F.2d 1247 (7th Cir.1983); *Swofford v. B & W, Inc.*, 395 F.2d 362, 364 (5th Cir.1968). Sears, conceding the utility of the Roberts quick-release mechanism, claims it is undeserving of patent protection because it fails to satisfy the statutory conditions of novelty, the anticipation feature of which is at issue in this case, and nonobviousness.

Sears contends that the trial court erred in submitting to the jury the two issues of anticipation, which negates novelty, and obviousness; Sears further argues that requiring the jury to determine these issues necessarily required it to interpret the claim in Roberts' patent, a function that is, with limited exceptions, for the trial court. We premise our discussion of these claims of error by recognizing that to the trial judge presented with an infrequent demand for a jury trial in a patent infringement case falls the most difficult task of determining which of the plurality of issues subsidiary to the ultimate determination of patent validity are subject to jury determination.

The indiscriminate use of inconclusive labels has engendered a great deal of confusion in the field of patent law. The lack of uniform decision and reasoning in circuit court opinions leaves the researcher of the issue whether the standards governing the determination of patentability present legal or factual issues with no definitive answer. Chief Judge Hastings, in recognition of this Circuit's contribution to the disorder, stated in a separate opinion in *Armour & Co. v.*

*Wilson & Co.*, 274 F.2d 143, 155 (7th Cir. 1960):

We have come to speak of questions of "facts," "primary facts," "subsidiary facts," "evidentiary facts," "ultimate facts," "physical facts," "documentary facts," "oral evidence," "inferences," "reasonable inferences," "findings of fact," "conclusions," "conclusions of law," "questions of fact," "questions of law," "mixed questions of law and fact," "correct criteria of law," and so on *ad infinitum*. The simple answer is that we are all too frequently dealing in semantics, and our choice of words does not always reflect the magic we would prefer to ascribe to them.[8]

We enter this labyrinth of conflicting case law with one basic guidepost—the Patent Act itself as interpreted by the Supreme Court. In *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court pronounced the ultimate question of patent validity a question of law; the determination of patentable invention requires the courts "to give effect to the constitutional standard by appropriate application, in each case, of the statutory scheme of the Congress." *Id.* at 6, 86 S.Ct. at 688. The determination requires an exercise in statutory construction, which, as the Supreme Court recognized, is statutory application in practice; the development of the factual content to which the statutory standard is to be applied is within the province of the fact-finder.

■■■ To be patentable, a device must be new, useful, and properly classified as invention. The issue of patentability, then, involves several inquiries: what constitutes the prior art and what does it disclose in scope and content; are there differences between the prior art and the claimed invention which render the latter an improve-

---

invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

**8.** As another commentator described the law-fact distinction,

No two terms of legal science have rendered better service than "law" and "fact." ... They readily accommodate themselves to any meaning we desire to give them.... What judge has not found refuge in them? The man who could succeed in defining them would be a public enemy.

L. GREEN, JUDGE AND JURY at 270 (1930).

ment on the former; and would the improvement have been obvious to one of ordinary skill in the pertinent art at the time the invention was made. *Armour & Co. v. Wilson & Co.,* 274 F.2d at 156.

The first two inquiries determine novelty under § 102; in simple terms, there must be a difference between each prior art reference and the device sought to be patented for the latter to be deemed "new." Only if such differences exist does § 103 require a determination whether the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of invention to one of ordinary skill in the art. Nonobviousness, then, distinguishes those useful innovations that are capable of sustaining a patent from those that are not. *Graham v. John Deere Co.,* 383 U.S. at 3–4, 11, 86 S.Ct. at 686, 690.[9]

We turn first to a more detailed discussion of novelty. A device is "new" if its essence has not been disclosed in a prior art device. Section 102(a), (e), and (g) provide, in distilled form, that a device lacks novelty if it has been anticipated by a prior patent or publication in this or a foreign country or by prior use, knowledge, or invention in this country. This court has stated that anticipation is strictly a technical defense; "[u]nless all of the same elements [of the patented device] are found [in a single prior art device] in exactly the same situation and united in the same way to perform an identical function," the former is not anticipated by the latter. *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.,* 436 F.2d 1180, 1182–83 (7th Cir.1971). We also have stated, however, that "[w]hen the only features distinguishing the purported invention from a prior art product are insubstantial, the earlier may properly be said to anticipate the later product." *Shelco, Inc. v. Dow Chemical Co.,* 466 F.2d 613, 614–15 (7th Cir.), *cert. denied,* 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972). Thus, in this Circuit, the test has been one of substantial identity;[10] "[i]t is sufficient if the general aspects are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art." *Amphenol Corp. v. General Time Corp.,* 397 F.2d 431, 438 (7th Cir.1968).

The purpose of the 1952 revision was to foster "uniformity and definiteness." *Graham v. John Deere Co.,* 383 U.S. at 18, 86 S.Ct. at 694. The revision was not, however, intended to change the level of patentable invention. *Id.; Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 279, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976) (Invention is a constitutional requirement). Congress believed that an inquiry into obviousness would "permit a more practical test of patentability," with emphasis on inquiry rather than quality. *Graham v. John Deere Co.,* 383 U.S. at 17, 86 S.Ct. at 693.

9. Although the conditions of novelty and utility were incorporated in the original Patent Act of 1793, nonobviousness, as the third condition of patent validity, was introduced by the Patent Act of 1952. Prior to 1952, courts applied the judicially-created criterion of "invention," first enunciated in *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851). The application of the "invention" criterion produced an inconsistent and unpredictable body of law because it allowed the ultimate determination of patentability to be based upon the "subjective whims" of the court. *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963, 967 (7th Cir.1979). As Judge Rich, a co-author of section 103, stated:

In the final analysis, all it amounted to was that if the court thought the invention, though new and useful, was not patentable, then it did not involve "invention" and vice versa. The requirement for "invention" was the plaything of the judges who as they became initiated into its mysteries, delighted to devise and expound their own ideas of what it meant; some very lovely prose resulting.

Rich, *Principles of Patentability,* 28 Geo.Wash. L.Rev. 393, 404 (1960), cited in *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d at 967 n. 10.

10. The classic test of anticipation has been stated to be: That which will infringe, if later, will anticipate, if earlier. *See, e.g., Knapp v. Morss,* 150 U.S. 221, 228, 14 S.Ct. 81, 84, 37 L.Ed. 1059 (1893). Although this court clearly views the infringement inquiry as to identity or substantial equivalence, the final determination of which requires, in the ordinary case, a balancing of credibility, persuasiveness, and the weight of the evidence, as a question of fact, *see, e.g., Wolens v. F.W. Woolworth Co.,* 703 F.2d 983, 990 (7th Cir.1983), the issue of novelty differs in one important respect: novelty is a component of patent validity, which is an ultimate question of law. *See infra* p. 1333.

See also *Popeil Brothers, Inc. v. Schick Electric, Inc.,* 494 F.2d 162, 164 (7th Cir. 1974); *Deep Welding, Inc. v. Sciaky Brothers, Inc.,* 417 F.2d 1227, 1234 (7th Cir.1969).

■ Substantial identity is determined by reference to the language of the patent claims, which define the ambit of the claimed invention. Thus, the determination whether a patented device has been anticipated by a prior art reference requires a two-step analysis: (1) the identity of the patented device, as well as its scope, must be determined by the claims submitted to and allowed by the Patent Office; and (2) the patented device, as so defined, must be compared with each prior art reference.

■ Construction of the patent claims is a question of law, *Super Products Corp. v. D P Way Corp.,* 546 F.2d 748, 756 (7th Cir.1976), and thus ultimately the responsibility of the trial judge in a patent infringement case tried to a jury. If, however, extrinsic evidence is needed to explain a term of art in a patent claim, the meaning of which is disputed, a narrow factual issue for jury determination is presented. *Id.*

■ The issue whether a prior art reference and the patented device are substantially identical may be treated as a question of pure construction in a case in which no substantial disputes of fact are presented and the clarity of the patent documents is such that the court can determine from mere comparison of the descriptions contained therein whether the devices at issue are substantially identical.[11] However, where material factual disputes exist as to the scope and content of the prior art and the differences between each prior art reference and the patented device, as identified by the trial court, issues for jury determination, if a jury is to be the fact-finder, are presented. This is not to say that the

trial court does not maintain ultimate control over the issue of anticipation. To hold otherwise would be to vitiate the Supreme Court's determination that patent validity ultimately is a question of law. Novelty, like utility and nonobviousness, is a condition precedent to patentability. In any given case, lack of novelty may be the ultimate determinant of patent validity; as such, the issue must be deemed to be within the province of the court.

Assuming differences between the patented device and each prior art reference preclude a finding of anticipation, under the broader obviousness test, the disclosures of the prior art references may negative invention because in their light the patented device would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art.

*Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), established the exclusive means by which to measure nonobviousness under section 103. *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963, 972 (7th Cir.1979). In reviewing a trial court's application of the *Graham* standard, we are mindful of the Court's admonition that "strict observance of the requirements laid down here will result in that uniformity and definiteness which Congress called for in the 1952 Act." *Graham v. John Deere Co.,* 383 U.S. at 18, 86 S.Ct. at 694.

While the ultimate question of patent validity is one of law, ... the § 103 condition ... lends itself to *several basic factual inquiries.* Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. *Against this background, the obviousness*

---

11. *See Singer Manufacturing Co. v. Cramer,* 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437 (1904). One commentator has counseled caution in applying the *Singer* rule to the issues of infringement and anticipation:

[A] trial judge, who is a layman in the field contemplated by the patent, may earnestly but erroneously believe that the patent docu-

ments and devices before him are understandable without extrinsic evidence, when subtleties of a technical nature or otherwise, which are developed through expert testimony or the like, might substantially change the import thereof.

Zarley, *Jury Trials in Patent Litigation,* 20 Drake L.Rev. 243, 249 (1971).

*or nonobviousness of the subject matter is determined.* Such secondary considerations as commercial success, long felt but unresolved needs, failures of others, etc. might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevance.

*Id.* at 17–18, 86 S.Ct. at 693–694 (emphasis added).

One can readily see that the factual inquiries necessary to the determination of anticipation (*i.e.,* the scope and content of the prior art and differences between each prior art reference and the claims of the patent in suit) also compose part of the tripartite factual inquiry upon which the determination of obviousness must rest. The anticipation inquiry, itself largely factual in nature, *Hughes Tool Co. v. Ingersoll-Rand Co.,* 437 F.2d 1106, 1108 (5th Cir.), *cert. denied,* 403 U.S. 918, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971), is subsumed within the obviousness inquiry. Under the obviousness test, however, an additional factual inquiry is to be made: the level of ordinary skill in the pertinent art must be determined.

Several crucial concepts, as expounded upon in *Graham* and its progeny, are embodied in the section 103 standard.

The nature of the problem confronting the would-be inventor defines the relevant prior art. *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d at 975. Pertinent art has been defined as that art to which one can reasonably be expected to look for a solution to the problem that the patented device attempts to solve. *Morpul, Inc. v. Crescent Hosiery Mills,* 265 F.Supp. 279, 303 (E.D.Tenn.1967). Inquiry into the level of ordinary skill in the pertinent art is necessary because a patentable invention must evidence more ingenuity and skill than that possessed by an ordinary mechanic acquainted with the business. *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d at 975.

Obviousness is measured not by determining what would have been obvious to actual artisans, but by considering whether a hypothetical person, possessing reasonable skills in the pertinent art and knowledge of all prior art, would have found the same solution when addressing himself to the same problem. *Id.* Invalidity should not be found on the theory that if a development is obvious to the court, it must have been obvious to a person having ordinary skill in the art. *Buzzelli v. Minnesota Mining & Manufacturing Co.,* 480 F.2d 541, 542–43 (6th Cir.1973). Judge Learned Hand put it this way:

To judge on our own that this or that new assemblage of old factors was, or was not, "obvious" is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it.

*Reiner v. I. Leon Co.,* 285 F.2d 501, 504 (2d Cir.1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).

It also should be borne in mind that obviousness can only be determined by reference to the precise facts presented; intuitive analysis distorted by the invention's simplicity and retrospective self-evidence must be avoided. Simplicity is not to be equated with obviousness. *Skee-Trainer, Inc. v. Garelick Manufacturing Co.,* 361 F.2d 895, 899 (8th Cir.1966). Experience has shown that some of the most simple advances have been the most nonobvious. *Van Veen v. United States,* 151 U.S.P.Q. 506 (Ct.Cl.1966). Patentability does not depend upon an astonishing breakthrough or creation of a new technology. *Sauer Machine v. Corrugated Finishing Products, Inc.,* 642 F.2d 203, 206 (7th Cir.1981). In addition, a court must be careful not to declare an innovation obvious because it has become obvious through hindsight." *Id.* " 'Obvious to try' is not the same as 'obviousness.' " *Novo Industri A/S v. Travenol Laboratories, Inc.,* 677 F.2d 1202, 1208 (7th Cir.1982), *quoting In re Goodwin,* 576 F.2d 375, 377 (C.C.P.A.1978), *aff'd,* 599 F.2d 1061 (C.C.P.A.1979).

■ Nor is the focus on the manner in which the invention was achieved or on the quality of the mind behind it. "[I]t is immaterial whether 'the invention resulted from long toil and experimentation or from a flash of genius.'" *Graham v. John Deere Co.,* 383 U.S. at 16 n. 8, 86 S.Ct. at 693 n. 8, *quoting* section 103 Reviser's Note.

■ Although prior to 1966 courts often dealt with obviousness as a question of fact, *Graham* established patent validity, of which nonobviousness is the ultimate determinant, as a question of law. This court consistently has viewed obviousness as a question of law, but that legal determination must rest upon the tripartite factual inquiry set forth in *Graham. See, e.g., Dickey-john Corp. v. International Tapetronics Corp.,* 710 F.2d 329 (7th Cir.1983); *Dual Manufacturing & Engineering, Inc. v. Burris Industries,* 619 F.2d 660 (7th Cir.) (en banc), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980). With the *Graham*-mandated factual determinations in hand,[12] the court must draw the inferences that the findings reasonably induce, and reach the ultimate legal question whether the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art and knowledge of all prior art. 35 U.S.C. § 103; *Sakraida v. Ag Pro, Inc.,* 425 U.S. at 280, 96 S.Ct. at 1536; *Moore v. Wesbar Corp.,* 701 F.2d at 1250.

■ *Graham,* in setting forth the analytical steps to be taken in determining obviousness, necessarily clarified the respective functions of judge and jury, as well as the scope of appellate review: disputes as to the *Graham* subsidiary facts are within the province of the jury; however, responsibility for the ultimate determination of obviousness lies with the trial judge, who must determine whether the facts as found by the jury fall within the legislative standard.

■ An appellate court does not sit to adjudicate *de novo* the factual issues underlying the determination of obviousness. When made in a bench trial, the *Graham* factual determinations are reviewed under the clearly erroneous standard of Rule 52(a), Federal Rules of Civil Procedure. When these factual determinations have been made by a jury, our review is limited, assuming the instructions are not an issue, to ascertaining whether the denial of a motion for a new trial or a motion for a judgment notwithstanding the verdict was an abuse of discretion. An appellate court's independent review of the trial judge's conclusion of law is predicated upon the factual determinations made in the district court. *See generally* 2 D. CHISUM, PATENTS § 5.04[3] n. 32 (1983).

Before turning to an examination of how decisional responsibilities were allocated between judge and jury in this case, we must determine whether there was a total absence of subsidiary factual disputes that would have required the trial judge to dispose of the entire case as a matter of law. *Dual Manufacturing & Engineering, Inc. v. Burris Industries,* 619 F.2d at 663.

### III

Shown below in Figure 1 is a conventional socket wrench. It consists of a handle (3)

---

12. As we previously noted, the first two *Graham* factual inquiries as to the scope and content of the prior art and the differences between the prior art and the claims at issue are relevant to the determination of anticipation as well, the key distinction being that in determining anticipation, the prior art references are viewed singly. At this juncture, however, the analyses of anticipation and obviousness diverge. Although the required factual determinations may necessarily predestine a specific resolution of the question whether two devices are substantially identical, a relatively unambiguous standard, the same cannot be said with respect to resolution of the question of obviousness, which requires "the application of a highly ambiguous legislative standard to a particular set of facts." *See* Comment, *Appellate Review of Determinations of Patentable Inventions,* 29 U.Chi.L.Rev. 185, 194 (1961). As a policy matter, the labeling of obviousness as a question of law and the requirement of a specific factual foundation for its determination serve as checks on an otherwise highly subjective determination.

and a detachable socket (2). The pushbutton (1) on the head of the wrench corresponds with the pushbutton (also 1) on Roberts' quick-release mechanism shown below in Figure 2. Dr. Youngdahl, Roberts' expert witness, explained the structure and operation of the Roberts quick-release mechanism. The principal object of Roberts' device was to provide a means for releasing a socket from a conventional wrench and engaging another in a one-handed operation. Although the Roberts quick-release mechanism retains the ball-type detent (4) utilized in the conventional wrench, in place of a spring directly behind the ball, Roberts uses a springloaded pin (5) that moves in the center of the stud (6). The pin contains a specially-shaped camming recess (7). "Selective alignment," a key feature of the Roberts device, refers to the type of ball and pin positioning that results from the "camming action" between the sloped recess of the pin and the curved surface of the ball. In the socket retaining position, small longitudinal movements of the pin result in changes of position of the ball with respect to the pin; the ball and pin can assume one of an infinite number of positions relative to one another depending upon the depth of the socket dimple. The ball will be cammed outward only as far as is necessary to engage the socket dimple. This "selective alignment" feature is claimed to offer unique advantages: it results in a smooth, reliable quick-release operation; it allows use of sockets with various dimple depths; it automatically compensates for socket wear; it prevents "hang up" of the ball detent; and it allows for one-handed operation in both removing and replacing sockets. To release the socket, the pushbutton (1) is depressed, moving the pin to the position where the ball can begin to move along the sloped recess of the pin. Once the ball is in the recess, the socket can fall of its own weight. With the pushbutton still depressed, a new socket may be slipped on and securely retained by releasing the pushbutton, all in a one-handed operation. It is obviously easier to use the wrench than it is to understand what makes it easier to use.

**F I G. I**

**F I G 2**

Sears' expert witness, Smyers, testified that nothing in Roberts' claim denominates his device as a quick-release mechanism; he further testified that Roberts' claim does not specify a particularly-shaped recess.

The trial transcript discloses numerous factual disputes as to the structures, operations, and functions of, and the differences between, the prior art and the patent in suit.

Dr. Youngdahl testified that the Carpenter device, a locking device for a socket wrench patented in 1928 (U.S. Patent No. 1,660,989) was not a quick-release mechanism, but was designed to effect a positive lock of the socket on the wrench through the use of a spring arm.[13] He further testified to the Carpenter structure and operation as follows: Carpenter's essential element, the spring arm upon which the ball usually rests,[14] was designed to *prevent* the ball from moving into and becoming stuck in the recess, thereby inadvertently allowing unlocking of the socket. Although Carpenter contains a long, narrow, triangularly-shaped slot, its purpose is to receive the spring arm; to release the lock, the user pushes the button inward to place the recess under the ball; the ball, however, does not move into the recess because the spring arm continues to bear it outward. Therefore, it is claimed the socket must be removed forcefully; it will not fall of its own weight. Insofar as the Carpenter device discloses a pushbutton, pressing it merely unlocks the socket but does not effect release or removal of the socket from the wrench.

Youngdahl further testified that if the spring arm is removed, a "camming action" between the inclined surface of the recess and the ball may or may not force the ball toward the locking position; it "may cam" or it "may jam"; in Youngdahl's opinion, the Carpenter geometry cannot provide for selective alignment. On cross-examination, Youngdahl, asked to assume that the Carpenter device contained a very weak spring arm, agreed that the force generated by the "camming action" might overcome the spring force and allow the ball to move into the recess, thereby effecting release of the socket.[15] He further stated, however, that a weak spring arm will not effect the locking of the socket on the wrench, the primary goal of the Carpenter device.

Smyers contrarily testified that Carpenter was a quick-release wrench. Although Smyers conceded that the text of the Carpenter patent did not so specify, he stated that he believed the spring arm was an optional feature. Smyers testified that when the pushbutton is depressed, the recess in the Carpenter device will be aligned with the ball. The weight of the socket will force the ball into the recess, releasing the socket. He further testified that a camming action between the slightly slanted sides of the recess and the ball will force the ball to its locking position.

Youngdahl's testimony on the Gonzalez device, a ball socket attachment for impact tools and socket wrenches patented in 1965

---

**13.** It is an oversimplification of the devices to state that the locking and releasing functions are mere reciprocals. A device designed to achieve a positive locking effect may contain elements of various shapes and sizes in a particular combination that will not effect release in the same manner as another device with a different geometric composition.

**14.** Youngdahl testified that the Carpenter pin will support the ball only if the user attempts to pull the socket off when the wrench is locked.

**15.** In Youngdahl's opinion, even if the spring arm were weak enough to allow the user to manually remove the socket with ease, the ball will still offer resistance because the spring is behind it. Conversely, Roberts, though recognizing that the socket may not always fall of its own weight, stated that the socket always may be removed without any resistance on the part of the ball.

(U.S. Patent No. 3,172,675), may be summarized as follows: Gonzalez was designed to effect a positive lock of the socket on the wrench under the adverse conditions encountered with impact tools; the flat surface of the flange, with which the ball is normally engaged, "holds the ball out positively"; therefore, as planned, small longitudinal movements of the pin do not result in a change of position of the ball. Youngdahl stated that Gonzalez designed his device so that there would be a sharp discontinuity between the pin and flange, giving rise to the flat edge which supports the ball. When the pushbutton is depressed to release the socket, the ball drops into a space behind the flange. In Youngdahl's opinion, the open space behind the flange in Gonzalez performs only one function—receiving the ball in the socket removing position; it will not invariably perform the function of camming the ball outward into the socket retaining position,[16] as Roberts' recess will. In order to perform the dual function that Roberts' recess does, a sloping face must be cut in the flange, and the space behind the flange enlarged. It was Youngdahl's further opinion that realistic limitations on the size of a socket wrench would preclude the necessary enlargement of this space.

Smyers, however, was of the opinion that the space behind the flange in Gonzalez will receive the ball and allow the socket to fall of its own weight or be manually removed. It was his further opinion that a camming action between the sharp edge of the flange and the ball will move the ball upward to engage a new socket. He also stated that Gonzalez was designed to achieve "selective alignment"; the ball and pin can assume an infinite number of positions to engage shallow or deep-dimpled sockets.

16. Youngdahl did state on cross-examination that a camming action may take place between the ball and the sharp edge of the Gonzalez flange. He further stated that two components of force are generated by this action—an upward force and a lateral force. If the lateral force is greater, the ball will not move outward to engage the socket, and the user will have to invert the wrench and shake the ball into the aperture.

Sears has referred to the factual disputes raised by the expert testimony as "semantic quibbles," "linguistic sophistry," "petty details of terminology," "a grab-bag of contentions," and "imaginary distinctions." If that is all it may actually amount to after the differing views are weighed, it is for the jury to say as a factual matter, not for this court acting as a fact-finder. We, like the trial judge who denied without comment Sears' motion for summary judgment on the issue of patent validity and its subsequent motion for a directed verdict, believe the evidence presented was sufficient to raise questions of fact for jury determination on the elements, operations, and functions of the prior art references and the differences between them and the Roberts mechanism. We are not prepared to resolve the factual disputes between the experts and to come to our own factual conclusions.

### IV

Application of the principles enunciated in Section II, *supra,* to the "special verdict" procedure and attendant instructions utilized by the trial court mandates the conclusion that the jury was impermissibly allowed to be the final arbiter of patent validity.

Initially, we note that the jury was required to interpret the scope and identity of the Roberts patent claim.[17] That was asking too much of the jury. Construction of the patent claim, a prerequisite to the determinations of validity and infringement, is a matter of law for the court. Only a factual dispute as to the meaning of a term of art used in the patent claim, the resolution of which required resort to expert testimony, properly would

17. The pertinent portion of the instructions reads as follows:

You are instructed that in order to understand and identify the invention covered by the Roberts patent, his claim is to be viewed in the context of the written description of the patent, the patent drawing, and proceedings in the Patent Office. All must be read together in order to determine the scope and meaning of the claim.

have been submitted to the jury.[18] *Super Products Corp. v. D P Way Corp.*, 546 F.2d at 756. Because the trial court's construction of Roberts' claim was necessary to the jury's resolution of the factual disputes on the differences between the subject matter of the claim and the prior art, that error has shadowed the entire decisional process.

In addition, the jury was explicitly instructed, over Sears' objection, to determine the ultimate legal question of obviousness. An attendant instruction merely identified the *Graham* underlying factual inquiries and instructed the jury to "consider the evidence" presented by the parties with respect to them.[19] The jury, which evidenced confusion about the proper application of the legal standard of obviousness,[20] proceeded to return a "special verdict" that Roberts' patent would not have

been obvious to one of ordinary skill in the art in 1963–64. On Roberts' motion, the district court adopted as its own findings the "special verdicts" of the jury finding the Roberts patent was neither anticipated nor obvious and was infringed. The district court then added that the patent was "good and valid in law." Sears' motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial was denied.

Sears argues it was error to instruct the jury to determine the legal question of obviousness; Sears further contends that the jury made no factual findings subsidiary to the determination of obviousness, but rendered a finding solely on the legal issue, which then was adopted by the trial court. In apparent reliance upon this court's decisions in *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 468 F.2d 225 (7th Cir.

---

18. We note that the meaning of the term "selective alignment" has been questioned. Dr. Youngdahl testified that the term incorporates the concept of camming; implicit in Sears' contention that Roberts' claim does not state or suggest that camming is either a patentable feature or a saving limitation of the invention is its belief that the term "selective alignment" connotes something other than camming.

19. Pertinent portions of the trial court's instructions to the jury read as follows:

In the event that you determine that the Roberts wrench was new and not anticipated, *it is still necessary for you to determine whether the defendant has met its burden of proving that the Roberts patent would have been obvious* under Section 103, Title 35, United States Code....

\* \* \* \* \* \*

*You are hereby instructed that in determining whether the Roberts patent was obvious,* you should consider the evidence which has been presented by the parties with respect to the following matters: [Listing the *Graham* factual inquiries].

*You are to determine the question of obviousness* based on the perception of a person of ordinary skill in the art as of 1963....

Defendant has the burden of establishing obviousness and must prove obviousness by a preponderance of the evidence. If you find that the defendant has carried its burden, then you must answer "yes" to the following special verdict:

We, the jury, find that the subject matter of the Roberts patent considered as a whole was not obvious to one of ordinary skill in the art in the years 1963–64.

(Emphasis added).

20. During the course of its deliberations, the jury submitted to the trial judge the following request:

May we have some clarification of the obviousness test. We are hung up on trying to place ourselves in the shoes of the person having ordinary skill in the art. Must we attempt to determine whether the patent in suit is obvious by assessing whether or not that "person" in 1963 would have constructed the Roberts mechanism following an examination of the prior art. Our confusion has to do with the last three pages of your instructions [dealing with the *Graham* factual inquiries and the legal standard of obviousness].

The trial judge determined that the instructions as a whole adequately informed the jury of the applicable law, and denied the jury's request for clarification.

Part of the jury's question inquires whether it must attempt to determine obviousness "by assessing whether or not that 'person' [a person having ordinary skill in the art] in 1963 would have constructed the Roberts mechanism following an examination of the prior art." The issue is not whether the "person" would actually have constructed the Roberts mechanism; nor is the issue whether a person skilled in the art "could discover what applicant discovered by doing what he did." The issue under the law is whether it would have been obvious to do what he did. *Application of Lemin*, 364 F.2d 864, 867, 53 C.C.P.A. 1382 (1966).

1972), *cert. denied,* 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973), and *Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc.,* 619 F.2d 660 (7th Cir.1980), Roberts contends that the "special verdict" procedure did no more than ask the jury to resolve the material factual disputes; because a jury may not be asked to find facts in a legal vacuum, it was the trial court's duty to instruct the jury on the law applicable to the case. Roberts also appears to contend that the necessary factual findings should be presumed from the jury's verdict, and further that the trial court ruled on obviousness as a matter of law in denying Sears' motion for judgment notwithstanding the verdict.

In patent cases particularly, the type of verdict and instructions utilized by the trial court are keys to effectuation of the proper distribution of decisional responsibilities among judge and jury. In *Dual,* in a rare exercise of this court's supervisory powers, Judge Pell writing for the *en banc* court, Judge Sprecher dissenting, directed that one of two alternative procedural methods be utilized in those instances where jury trials of patent issues cannot be avoided. The preferable method was stated to be the use of special verdicts: "[b]ecause only issues of fact subsidiary to the legal question of obviousness are within the province of the jury, its resolution of those issues of fact should ordinarily be articulated in special verdicts under Rule 49(a), Fed.R.Civ. P." [21] Alternatively, it was stated that the "same result may be achieved by special interrogatories returned with a general verdict under Rule 49(b), a device primarily designed to test the jury's application of the law in reaching a general verdict." *Dual Manufacturing & Engineering, Inc. v. Bur-*

*ris Industries, Inc.,* 619 F.2d at 667. But, it was added that the use of a general verdict, with or without special interrogatories, ordinarily will serve no purpose because the trial court still must decide the legal issue of obviousness. It was pointed out that although a general verdict standing alone will give rise to the presumption that the factual issues have been resolved in favor of the prevailing party, presumptions are of little use to a trial court fulfilling its obligation to decide the ultimate legal issue of obviousness. The *Dual* court concluded that "the special verdict device may allow the jury, if one is utilized, to serve a useful function in resolving specific *contested issues as to the concrete facts, and it should be used." Id.* (emphasis added).

In this case the directions of *Dual* were not followed. The verdict form utilized was "special" only in the sense that the legal issue of patent validity was broken down into the components of obviousness and anticipation. Proper special verdicts, however, are to be addressed only to the subsidiary questions of fact that compose the *Graham* tripartite inquiry upon which the legal determination of validity must rest, not to the obviousness and anticipation components of patent validity themselves.

In light of this court's instructions in *Dual* that special verdicts should be used, the question arises whether the failure to utilize proper special verdicts constitutes an abuse of discretion. At least one circuit court has suggested it may.[22] In *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.,* 468 F.2d 225 (7th Cir.1972), this court declined to find in the circumstances of that case an abuse of discretion in the trial court's refusal to submit thirty-two special

---

**21.** Rule 49(a) of the Federal Rules of Civil Procedure provides that "the court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact.... The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue."

**22.** *See Baumstimler v. Rankin,* 677 F.2d 1061, 1071 (5th Cir.1982), in which the court stated: "While the use of special interrogatories is left to the sound discretion of the trial judge, failure to utilize this method in a patent case places a heavy burden of convincing the reviewing court that the trial judge did not abuse his discretion." We note that the Fifth Circuit had not even exercised its supervisory powers to direct that certain procedures be utilized in patent cases.

interrogatories to the jury. However, since the decision in *Panther Pumps* this court has exercised its supervisory powers to direct that certain procedures be followed. What was done in the present case is exactly what *Dual* sought to avoid. The court undertook to utilize special verdicts, but in doing so turned the whole case over to the jury. Having chosen the special verdict procedure, it was error to ignore *Dual*'s instructions. But, even apart from *Dual,* the procedure utilized did not comport with *Panther Pumps.*

In *Panther Pumps,* both parties and the trial court had confused issues of fact with issues of law; all issues relating to validity and infringement were submitted to the jury. Four "special interrogatories" asked whether the two patents were valid and whether they were infringed. It is important to note that the issue whether the trial court erred in permitting the jury to decide the legal question of obviousness was not specifically before the court in *Panther Pumps.* Rather, defendant argued that in view of the way the jury verdict was reached, it was impossible for a reviewing court to determine whether the three-step analysis required by *Graham* had been properly made.

The *Panther Pumps* court reiterated that obviousness is a question of law and that in a patent case, as in any other case tried to a jury, questions of law are for the court and questions of fact are for the jury. Allocation between judge and jury of their respective decisional responsibilities may be accomplished by the use of special verdicts or

special interrogatories or *"by the court's instructions to the jury before it returns a general verdict." Id.* at 228. That the jury returns a general verdict may not preclude appellate review of the legal conclusion on validity under the *Graham* guidelines *if* the jury was properly instructed.

> As in any other jury trial, the court's rulings on questions of law are subject to review. If the ultimate issue of validity depends on subsidiary fact questions, it is the court's duty to instruct the jury that it should return one verdict if the facts are found one way and a different verdict if the facts are found otherwise.

*Id.* On appeal, the reviewing court will presume that "the disputed matters of fact have been resolved favorably to the prevailing party in accordance with the trial judge's instructions." *Id.* Because defendants did not challenge the propriety of the trial judge's instructions, they were not an issue before the court in *Panther Pumps.*

*Panther Pumps* did make clear, however, that a compulsory instruction must be given when a general verdict is utilized: "[I]t is the court's duty to instruct the jury that it should return one verdict if the facts are found one way and a different verdict if the facts are found otherwise." *Id.* In other words, the jury must be instructed that if it finds facts A, B, C, and D, it must render a certain verdict. Anything less than strict adherence to this procedure by a trial court constitutes an abdication of its active duty to retain ultimate control over the issue of obviousness.[23]

---

23. In *Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir.1983), this court reviewed a "general verdict" and attendant instructions in the analogous context of a *per se* violation of the Sherman Act. We noted that although the verdict form utilized by the district court was "special" in the sense that the issues of causation and damages were separated from the other issues, it was general in that the jury was asked in two questions to determine whether defendants had violated sections 1 and 2 of the Act; in other words, the liability issue "was not broken down into a series of questions, from the answers to which the judge might have determined the judgment." *Id.,* at 217. We made clear that submitting to the jury the issue whether there has been a *per se* violation of the

Act is proper only if the trial judge retains control over the issue through strict adherence to the following procedure:

> [B]efore the jury is freed to find a *per se* violation, the trial court must determine that there is evidence from which the jury may find that the defendants engaged in certain conduct ... which conduct, the court (not the jury) must decide, constitutes a *per se* violation. In such a case, it must be explained to the jury that its function is to decide whether certain conduct, described with precision in the instruction, did or did not occur.... [T]he active role imposed upon the trial judge with respect to the concept of *per se* violations demand[s] that the

*Panther Pumps* itself does not suggest that the trial judge, having given the required compulsory instruction, also must rule independently on the issue of obviousness after the general verdict is returned. Under *Panther Pumps,* the trial judge retains ultimate control over the legal question of patent validity through the compulsory instruction supporting a general verdict. In *Dual,* it was stated that on the basis of the factual findings presumed from a general verdict, the court must *then* decide the issue of obviousness. It amounts to the same thing. Under the *Panther Pumps* procedure, the jury, in finding certain facts, also is permitted to express its opinion on the legal issue, but the responsibility for deciding the legal issue remains with the trial judge, guided by the jury's factual determinations. The procedure and instructions utilized in this case were deficient in every respect.

There was no attempt in the present case to utilize the *Panther Pumps* -sanctioned general verdict procedure.[24] The jury merely was instructed to determine obviousness; it was not instructed that if the evidence supported a particular set of fac-

> jury be instructed that only if it [finds] that a particular defendant ha[s] done A, B, C, and D, [can] it proceed to find that such conduct constitute[s] a *per se* violation.
> *Id.,* at 219, 220.

**24.** We are cognizant of the Fifth Circuit's decision in *Control Components, Inc. v. Valtek, Inc.,* 609 F.2d 763 (5th Cir.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). In *Control Components,* the trial court instructed the jury to determine obviousness; the court further instructed the jury that the *Graham* factual inquiries were the "primary factors to consider" in determining obviousness, and submitted to the jury the question whether the differences between the subject matter patented by the claims and the prior art were such that the subject matter as a whole would have been obvious to one of ordinary skill in the art in 1966. A "general verdict" was entered, finding that the differences would not have been obvious. The court of appeals held the trial court did not err in submitting the question to the jury. "The interrogatory was not so broadly framed as to leave the ultimate determination of obviousness to the jury." *Id.* at 767. Under the trial court's instructions, the jury was to base its general verdict on the *Graham* factors, appropriate questions of fact.

tual findings, a certain verdict on obviousness was required. The trial court abdicated its control over the legal issue.

Nor are we willing to construe the trial court's determination that the patent was "good and valid in law" as an indication that it fulfilled its duty to "give effect to the constitutional standard, by appropriate application, in each case, of the statutory scheme of the Congress." *Graham v. John Deere Co.,* 383 U.S. at 6, 86 S.Ct. at 688. The trial court's determination was a meaningless pronouncement. It is the compulsory instruction mandated by *Panther Pumps* that permits the presumption that the factual disputes have been resolved in favor of the prevailing party. Under the circumstances of this case, the trial court could not presume, nor may we, that the facts were found in favor of Roberts merely because the jury ultimately made the legal determination that his patent would not have been obvious. The trial court had no sufficient factual basis, presumed or otherwise, for ruling that the patent was "good and valid in law."

Relying on *Panther Pumps,* the court of appeals held it would presume that the disputed matters of fact were resolved in favor of the prevailing party. The court of appeals' independent review of the record disclosed substantial evidence in support of the jury's presumed findings of fact. The court further determined that the trial court had correctly applied the law to these facts; because the trial court, in addressing the motion for a judgment notwithstanding the verdict, necessarily considered and rejected defendants' contention that the patent was obvious as a matter of law, and because, in ruling on the motion, the trial court indicated that its conclusion would not differ from the jury verdict, the judgment that the patent was valid was affirmed.

We do not believe that the procedure utilized by the trial court in *Control Components* comported with this court's decision in *Panther Pumps.* At a minimum, the *Panther Pumps* general verdict procedure requires "an instruction of the on-the-one-hand and on-the-other-hand variety." *Id.* at 775 (Rubin, J., concurring in part and dissenting in part). We would further note that Judge Rubin's viewpoint has found favor in a subsequent Fifth Circuit decision. *See Baumstimler v. Rankin,* 677 F.2d 1061 (5th Cir.1982).

We cannot sanction the procedure utilized by labeling the jury's determination of obviousness as a "general verdict." Affixing that label provides an insecure basis for presuming the *Graham* factual determinations have been made. That would be nothing less than sophistry. We believe the placement of a "general verdict" label on a procedure that merely asked the jury to pass upon the ultimate legal question, guided only by general instructions, would in effect dispense with the specific factual determinations called for in *Graham* as a predicate for the court's determination of the legal question of obviousness. We hold the procedure and instructions utilized impermissibly allowed the jury to be the final arbiter of the legal issue of patent validity. This constitutes reversible error.

### V

Having concluded that the district court committed reversible error, the question remains whether remand for a new trial is the appropriate disposition. Citing *Dual,* Sears contends that the question of patent validity is one of law for this court to decide; moreover, Sears argues, the patent in suit and the prior art are not complex or highly technical, and are easily understandable from the drawings and descriptions in the documentary evidence.[25] Sears also appears to suggest that the erroneous procedure utilized by the trial court, which resulted in "all but worthless" jury verdicts, militates in favor of determination by this court of the legal issue of patent validity.

 Although, from the record we have before us, we might be able, after reviewing and weighing the evidence, to arrive at what we consider to be the correct decision on anticipation and obviousness, we would have to find certain facts, as well as determine and apply the law. We believe that the judicial dispute resolution system established by our Constitution should not be infringed by the *ad hoc* shortcut of dispensing with trial judge and jury. In light

of this constitutional system and the judicially-created doctrines that relegate an appellate court to its proper role in the system, Sears' arguments on the extent to which we may examine and evaluate the conflicting evidence afford no basis for this court to proceed further. We do not intend as a court to make a jury's factual decisions. It is elementary that the documentary evidence rule cannot be invoked in a case, such as this, in which technical experts have been used to interpret and clarify the structures, operations, and functions of the prior art and the patent in suit. *See Wolens v. F.W. Woolworth Co.,* 703 F.2d 983 (7th Cir.1983); *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 445 F.2d 84, 87 (7th Cir.1971). In a patent case, as in any other, due regard must be given to the jury's opportunity to judge the credibility of the witnesses and to appraise the significance of conflicting testimony. *Reese v. Elkhart Welding and Boiler Works, Inc.,* 447 F.2d 517, 521 (7th Cir.1971).

In addition, Sears' reliance on *Dual* is misplaced; the record in *Dual* revealed no subsidiary factual disputes, a circumstance that permitted this court to apply the legislative standard to the uncontradicted facts. Conversely, as demonstrated in Section III, *supra,* numerous subsidiary factual disputes were present in this case. It remains a mystery to this court how these factual disputes may have been resolved by the jury or what part *Graham* actually played in the decision of this case. The procedure utilized by the trial court precludes us from confidently presuming that these factual disputes were resolved in favor of Roberts.

This court has long eschewed examination of the question of obviousness in a factual vacuum. An early expression of this court's desire that "verbal expression" be given to each analytical step mandated by *Graham* can be found in *Cloud v. Standard Packaging Corp.,* 376 F.2d 384 (7th Cir.1967). The *Cloud* court refused to imply the *Graham* findings in the district court's

---

**25.** At trial, in arguing for introduction of a drawing depicting the Wilson device, Sears' counsel stated that mechanical drawings are 

"intrinsically hard for anybody to understand and certainly for laymen."

general conclusion that the defendants had failed to carry their burden of proving the invalidity of the presumptively valid patents in suit. In that case, the evidence was comprised of the uncontradicted explanation of a number of prior art patents by one expert witness. This court suggested that "perhaps" it could make the validity determination "without trespassing upon the area of fact finding." *Id.* at 391–92. Nevertheless, even in those less complicated circumstances, we held it was sounder for the initial determination to be made by the trial court. If we undertake to do it all here, no court remains where the parties can obtain review as a matter of right. *Id.* at 391.

We see no alternative but to remand this case to the district court for a new trial in accordance with this opinion. Nothing we have said is intended to foreshadow the final result to be reached in this case on the merits.

Each party shall bear its or his own costs.

POSNER, Circuit Judge, with whom ESCHBACH, Circuit Judge, joins, concurring and dissenting.

I agree that the judgment for Roberts cannot stand and I also agree that the method by which questions of fact pertaining to the validity of Roberts' patent were put to the jury was incorrect. But I think the patent is obvious as a matter of law and therefore that the case should not be remanded for a new trial but ended now with an order to dismiss the complaint.

A socket wrench has two parts (see Figure 1): the shaft which the person using the wrench grasps and turns (labeled "10" in Figure 1), and a detachable socket (16) which grips the bolt that the wrench is turning. Usually the wrench comes with a number of sockets of different size so that a single wrench can be used to turn bolts of different width.

FIG 1

The principle of the socket wrench is not new. The alleged novelty of the Roberts patent is in the mechanism, shown in Figure 2, for releasing the socket when the user of the wrench wants to change sockets. The knob (22) at the top is the pushbutton (also 22) on the back of the head of the wrench in Figure 1. Notice that the pushbutton is not depressed. In this, the locked position, the pin (20) to which the pushbutton is attached is pressing a little ball (18) against, and partially through, a ring in the wall of the mechanism. (The ball cannot fall out, because its diameter is greater than the ring's.) The part of the ball that protrudes outside the ring (24) is lying in a depression in the inner wall of the socket (not shown in Figure 2), thereby holding the socket onto the wrench. If you press the pushbutton, this will force the pin down until the hollow space in it (26) is next to the ball, and the weight of the socket will then force the ball into that space. There will now be nothing holding the socket to the wrench, and the socket will fall of its own weight.

FIG 2

This is the Roberts quick-release mechanism. It was a huge commercial success—though this may have owed a lot to Sears' promotion and marketing of it—because it enabled changing sockets with one hand. By holding the wrench face downward and pushing the pushbutton with your thumb you can drop off the socket attached to the wrench; by keeping the button pressed down you can insert the wrench into a different socket simply by pressing the head of the wrench down onto that socket; and you can then lock the socket to the wrench simply by releasing your thumb.

Successful though it has been, the Roberts patent is invalid if "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The word "obvious" in the statute is not obvious. Its legal meaning must be derived from the policies that inform the patent statute. The purpose of allowing people to obtain patents is strictly utilitarian—to create incentives to invent useful things. "The patent monopoly was not designed to secure to the inventor his natural right in his discoveries. Rather, it was a reward, an inducement, to bring forth new knowledge." *Graham v. John Deere Co.,* 383 U.S. 1, 9, 86 S.Ct. 684, 689, 15 L.Ed.2d 545 (1966). Since new knowledge is a social good, it might seem that no limits should be placed on the scope or duration of patent protection. The problem is that patent protection has a dark side, to which the term "patent monopoly" is a clue. A patent enables its owner to monopolize the production of the things in which the patented idea is embodied. To deny that patent protection has this effect, the position that a footnote in the majority opinion attributes to the chief judge of the new patent appeals court, is—with all due respect—to bury one's head in the sand. A patent excludes others from using the patented invention except on the terms set by the patent owner. If the invention is a valuable one he will be able to charge a substantial royalty to manufacturers who want to use it; and by increasing the cost of manufacture the royalty may well result in higher prices to consumers and a lower output of the manufactured product than if the invention were freely available to anyone who wanted to use it. See Scherer, Industrial Market Structure and Economic Performance 442, 450 (2d ed. 1980); Stigler, The Organization of Industry 123–25 (1968).

This is not to say that no patents should be granted. An invention might not be made (not so soon, anyway) unless the inventor could get a patent; for he might not be able to recoup his investment in the invention if anyone could use it without charge, and therefore might have no incentive to make the investment in the first place. In such a case granting a patent would increase rather than decrease the output of useful things. My point is only that the costs as well as benefits of patent protection are relevant to deciding which inventions should be patentable. The balance tips against protection when the invention is the sort that was likely to be made, and as soon, even if no one could have patented it. In such a case patent protection would have no good incentive effects but would have the usual bad monopoly effects. All this is well recognized in the law. The Supreme Court in the *Graham* case, referring to Thomas Jefferson's views on patent policy, said it was "the underlying policy of the patent system that 'the things which are worth to the public the embarrassment of an exclusive patent,' as Jefferson put it, must outweigh the restrictive effect of the limited patent

monopoly. The inherent problem was to develop some means of weeding out those inventions which would not be disclosed or devised but for the inducement of a patent." 383 U.S. at 10–11, 86 S.Ct. at 690.

The means chosen was the concept codified in the statutory term "obvious." See *id.* at 11–17, 86 S.Ct. at 690–693. The term identifies the cases in which patent protection is not necessary to induce invention and would therefore visit the costs of monopoly on the consuming public with no offsetting gains. As Professor Kitch has explained, "the basic principle on which the non-obviousness test is based [is that] a patent should not be granted for an innovation unless the innovation would have been unlikely to have been developed absent the prospect of a patent.... The nonobviousness test makes an effort, necessarily an awkward one, to sort out those innovations that would not be developed absent a patent system." Kitch, *Graham v. John Deere Co.: New Standards for Patents,* 1966 Sup. Ct.Rev. 293, 301. Now it is true that if the invention, though the sort of thing that ordinarily would be expected to take much time and toil to make, was made in a flash of genius, this does not make it "obvious." That is the force of the last sentence of section 103 ("Patentability shall not be negatived by the manner in which the invention was made"), as explained in the Reviser's Note. Much time and toil may have been spent in getting to the point where the spark of genius could be struck, and in any event people should not be encouraged to do drudge work by making it a condition of obtaining patent protection. But if a court thinks an invention for which a patent is being sought would have been made as soon or almost as soon as it was made even if there were no patent laws, then it must pronounce the invention obvious and the patent invalid.

We should do that here. Roberts' quick-release mechanism is simplicity itself and as one would expect its essential elements were already well known when it was invented. A man named Wendling had already patented the use of a pin and ball to hold a socket onto a wrench; his device lacked only the pushbutton. DePew had invented a mechanism for lifting heavy loads that worked like a socket wrench, with the load corresponding to the socket. A pin protruded from the top of the mechanism much like Roberts' pushbutton and was moved up and down to release the old load and lock on a new one to the lifting mechanism. Gonzalez and Carpenter separately had patented socket wrenches that had the essential elements of the Roberts patent, although the emphasis was on the locking rather than the release function. Wilson had submitted a patent application for a quick-release socket wrench almost identical to Roberts', though the application was abandoned and was not known to Roberts when he submitted his application.

The earlier patents and Wilson's application show that the basic ideas embodied in Roberts' patent were familiar ones. The idea that a socket could be locked to a wrench with a pin and ball device and that a pushbutton could be used to make the pin release one socket and lock in another was not new. The new thing was a device in which these ideas worked smoothly enough to allow sockets to be changed easily with one hand. That was Roberts' contribution, but it was entitled to patent protection only if it was unlikely to be induced except by the promise of a monopoly; and it was not. Everyone knew that there was a market for a quick-release wrench and everyone knew the elements of such a wrench—the pin and ball for holding the socket in place and the pushbutton for releasing the old socket and locking in the new. It was a question of coming up with a workable embodiment of these ideas, a task for which no special training, expensive equipment, or prolonged testing and refining were necessary. Nor is it the case that anyone except Roberts would have needed all these things but that Roberts was a genius and could make the invention without the investments in human or physical capital that others would have had to make. In the circumstances disclosed by this record, the probable effect of patent protection is to overcompensate the inventor, thereby drawing excessive resources into the making of minor improvements and imposing unnecessary costs of monopoly on the community.

I know that many lawyers and judges find the language of economics repulsive. Yet the policies that have given shape to the patent statute are quintessentially economic, and the language of economics is therefore the natural language in which to articulate the test for obviousness. And, with all due respect, I do not think the majority has succeeded very well in articulating an alternative test. Its opinion recites a number of general propositions about the meaning of obviousness. These propositions are quite unexceptionable but as is so often true the general principles that no one disagrees with do not decide the concrete case. Consider for example the statement in the majority opinion that "Simplicity is not to be equated with obviousness." I have no quarrel with this statement, though I would if the statement were "Simplicity is not probative of obviousness." But it is interesting to note that in the case the majority opinion cites for the proposition, *Skee-Trainer, Inc. v. Garelick Mfg. Co.,* 361 F.2d 895, 899 (8th Cir.1966), the patent was held invalid on the ground of obviousness. The patented device was a water-skiing aid which the court held should have been "obvious to a person having ordinary skill in the art" even though "nothing comparable to it ha[d] previously been constructed." *Id.* My brethren do not explain why if that device, or the mechanical devices held to be obvious as a matter of law in the *Graham* case, or the inventions held to be nonpatentable because of obviousness in other cases cited in the majority's opinion, such as *Republic Industries v. Schlage Lock Co.,* 592 F.2d 963, 975 (7th Cir.1979); *Popeil Bros. v. Schick Elec., Inc.,* 494 F.2d 162, 167 (7th Cir.1974); *Shelco, Inc. v. Dow Chem. Co.,* 466 F.2d 613, 616–17 (7th Cir. 1972), and *Deep Welding, Inc. v. Sciaky Bros.,* 417 F.2d 1227, 1239 (7th Cir.1969), are obvious, the Roberts wrench is not.

Because the majority opinion both confines itself to generalities in setting forth its test of obviousness and does not apply its test to the facts of this case, I am not clear whether its test differs other than verbally from my own. But whether it is the same test or a different test, a better test or a worse test, I am at a loss to understand why the court is unwilling to use it to decide this case once and for all, rather than remand for another trial. I think appellate courts are sometimes too hesitant to bite the bullet and dispatch a litigation that has gone on for too long. This is such a case.

All of us agree that the ultimate question of obviousness is for the court, not the jury, and that the jury's role is limited to deciding subsidiary fact questions, of the who-did-what-to-whom variety. *Dual Mfg. & Engineering, Inc. v. Burris Industries,* 619 F.2d 660, 662–64 (7th Cir.1980) (en banc). The only such question here is whether either Carpenter's or Gonzalez's design would allow the socket to be released with one hand, or stated differently whether once the pushbutton is pressed gravity will do the rest. (The reason there is uncertainty on this score is that neither wrench was placed in the record. The Gonzalez wrench was never even manufactured. A prototype of the Carpenter wrench may have been manufactured—the record is unclear on the point—but the wrench was never sold on the market.) Logically, before we can decide whether this question requires that a properly instructed jury be allowed to take a whack at this case before we do, we must decide whether the Roberts patent would be valid if the jury found that neither the Carpenter nor the Gonzalez design would have allowed a user to release sockets with one hand. If Roberts' patent would not be valid even on this assumption, a new trial would be an exercise in futility.

The court does not say whether it would be valid. I believe it would not be. The question is not whether the Roberts wrench was identical to something that had been invented earlier, but whether the advance that it made over the prior art was sufficiently great to deserve a patent. And in making that judgment we must consider not just Carpenter and Gonzalez, but Wendling, DePew, and Wilson. All five had the essential elements of the Roberts wrench. The Carpenter and Gonzalez wrenches may indeed have been completely identical to the Roberts wrench in their operating characteristics; but, at worst, they were clumsier versions that did not lend themselves to

changing sockets with one hand. Resolving all disputed factual issues in Roberts' favor, all one can say is that he used a familiar technology to make a wrench that was easier to use with one hand than its predecessors. This was "the work of a skillful mechanic" rather than of an inventor. *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683 (1851); *Republic Industries v. Schlage Lock Co., supra,* 592 F.2d at 975.

Obviously the majority must attach more weight than I do to the question how easy it would be to release sockets with one hand with a Carpenter or a Gonzalez wrench, if such a wrench existed. But I find it particularly difficult to agree that the question warrants a new trial in a litigation already so dated and stale as this one is. It began almost 15 years ago, in 1969, and if the judgment entered by the district court on remand from this court is appealed the appeal will not come back to us but will go to another court, the new United States Court of Appeals for the Federal Circuit, which no doubt will have its own ideas about this interesting case. (I will not speculate on the applicability of the law of the case doctrine in this unusual situation, or on whether if it is applicable it would have any bite in view of the lack of definiteness in the legal standard which this court has laid down in its opinion.) This could turn into a 20-year lawsuit over a patent that has now expired. We have too much protracted litigation in the federal courts. Three appeals in this case are enough.

Age is just one reason why I also believe that it was inappropriate to prolong this suit by agreeing to rehear the appeal en banc. This circuit grants rehearing en banc very rarely; this is only our nineteenth en banc decision in the last five years, an average of fewer than four a year. The basic reason for this parsimony is that a rehearing en banc imposes a heavy burden on an already overburdened court. "The heavy costs of the en banc procedure in terms of court time and litigant expense should establish a strong presumption against its use in most cases, rebuttable only by clearly demonstrable benefits." Note, *En Banc Review in Federal Circuit Courts: A Reassessment,* 72 Mich.L.Rev. 1637, 1645 (1974). This implies and we have stated that "the function of en banc hearings is not to review alleged errors for the benefit of losing litigants." *United States v. Rosciano,* 499 F.2d 173, 174 (7th Cir.1974) (per curiam). In other words, rehearing en banc should (in all but the rarest circumstances) be reserved for cases that have precedential significance, which this case does not. For we have lost our jurisdiction over patent appeals except for the tiny handful of cases in which the notice of appeal was filed before October 1, 1982, but in which no decision has yet been rendered. The Federal Circuit, which has acquired exclusive jurisdiction of patent appeals, has announced that it will not be bound by decisions of the other circuits. *South Corp. v. United States,* 690 F.2d 1368, 1371 (Fed.Cir.1982) (en banc). So the panel decision in this case, even if unsound, would still have been harmless, because it would have had no weight as precedent; and Judge Wood's painstakingly crafted en banc opinion, the work of many months, will have no weight as precedent either. I respectfully suggest that we cannot afford to waste judicial resources in this fashion.